**UNITED STATES of America, Plaintiff,**

v.

**CULBRO CORPORATION, Havatampa Corporation, Havatampa Holding Co., and Hav Corporation, Defendants.**

No. 77 Civ. 3149.

United States District Court, S. D. New York.

Jan. 2, 1981.

Stephen F. Sonnett, Bertha E. Hernandez, Antitrust Division, Dept. of Justice, Washington, D.C., for plaintiff.

Mudge, Rose, Guthrie & Alexander, New York City, for defendant Culbro Corp.; John J. Kirby, Jr., New York City, of counsel.

Howrey & Simon, Washington, D.C., for defendants Havatampa Corp., Havatampa Holding Co., and Hav Corp.; Richard T. Colman, Washington, D.C., of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

This is an application to modify a provision of an antitrust consent decree entered on July 7, 1978 enjoining the Culbro Corporation ("Culbro") from acquiring more than a twenty-five percent equity interest in the Havatampa (now Eli Witt) Holding Company (the "Holding Company"). The restraint expires in July 1983. Culbro seeks authorization now, however, to purchase a 100% equity interest in the Holding Company and its subsidiary, Eli Witt Company ("Eli Witt"), formerly Havatampa Company ("Havatampa"). The basis of the application is a substantial change in the affairs of Eli Witt, which on June 29, 1979, less than a year after entry of the consent decree, filed a Chapter XI petition under the Bankruptcy Act. Eli Witt was permitted to continue in business as a debtor-in-possession. It is contended that events immediately preceding and during the operation of Eli Witt as a debtor-in-possession that were not reasonably contemplated by the parties or the Court at the time the consent decree was entered justify its modification to avoid converting it into an "instrument of wrong."[1] In sum, it is urged that removal of the equity ceiling will not result in substantial anticompetitive consequences, but even more important, that the likely result of its continuance will be the forced liquidation of the debtor causing the loss of some 1,400 jobs, impairing the prospect of unsecured creditors recovering any substantial portion of the $26,000,000 owed them and imperiling the pension rights of Eli Witt's employees.

I. Events Preceding Entry of the Consent Decree.

Familiarity with prior proceedings leading to entry of the decree is assumed.[2] For purposes of this application, however, certain facts are noted. In 1976, Culbro and Havatampa were both manufacturers and wholesale distributors of cigars and other tobacco products in various states of the United States. Culbro was the second largest manufacturer and the third largest wholesale distributor of cigars in the United States. Havatampa was the sixth largest manufacturer and the largest wholesale distributor of cigars in the United States. Havatampa operated fifty-two distribution outlets located principally in the southeastern United States; it was the largest distributor in Florida and a major distributor in other areas of the southeast. Its distribution also extended to cigarettes, candy and sundry products. Through its General Cigar & Tobacco Co. ("General Cigar"), Culbro was and is a supplier to Havatampa and Eli Witt.

In late 1976, Oppenheimer & Company ("Oppenheimer"), an investment banking firm, negotiated an agreement to purchase the assets of Havatampa through the Holding Company, which had been expressly organized for that purpose. The purchase price was approximately $32,000,000. As part of the financing, Culbro purchased $2,750,000 of subordinated debentures of the Holding Company and acquired an option to purchase a twenty-five percent stock interest in it. Culbro still holds but has not exercised this option. Oppenheimer purchased all the Holding Company stock for $1,000,000 and also acquired $750,000 of its subordinated debentures, the balance of the issue. The Holding Company borrowed the balance of the purchase price from the Manufacturers Hanover Trust Company ("Manufacturers Hanover"), repayment of which was collaterally secured by liens against the plant, property and equipment acquired from Havatampa. Before the agreement could be consummated, the Government commenced this action to enjoin the Holding Company from acquiring Havatampa upon a claim that the acquisi-

---

1. *United States v. Swift & Co.*, 286 U.S. 106, 115, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932).

2. *United States v. Culbro Corp.*, 1977–1 Trade Cases ¶ 61,514 (S.D.N.Y.1977) (granting tempo- rary restraining order); *United States v. Culbro Corp.*, 436 F.Supp. 746 (S.D.N.Y.1977) (denying preliminary injunction but entering hold separate order).

tion violated section 7 of the Clayton Act.[3] In essence the complaint alleged that Culbro's acquisition of an interest in Havatampa would result in lessening competition among cigar manufacturers who might be foreclosed from selling through the distribution houses owned by Havatampa and that other adverse horizontal and vertical effects would result. This Court entered a temporary restraining order requested by the Government.[4] Following a hearing before Judge Robert J. Ward of this Court,[5] the Government's motion for a preliminary injunction was denied on the ground that the Government had failed to establish a reasonable probability of interim harm to the public. However, the Court entered a hold separate order, restricting Culbro's involvement in Havatampa's business pending a trial on the merits.[6] As modified by the hold separate order, the transaction was consummated on July 30, 1977. Thereafter and during the course of pretrial discovery proceedings, the parties negotiated and agreed upon the terms of the consent decree now sought to be modified.

Pursuant to a provision of the decree, Havatampa in December 1978 divested itself of its cigar manufacturing operations and assets to an independent company, which retained the Havatampa name, and continued in business solely as a distributor of cigars, cigarettes, candies and related products under the name of Eli Witt. This divestiture eliminated the horizontal effects alleged in the Government's complaint. Since the divestiture there has been no competition between Eli Witt and Culbro at the manufacturing level.

Section IX of the decree restricted the sale of Culbro cigars to Eli Witt distribution outlets for a period of twenty years to 12.9% of the dollar amount of Eli Witt's total cigar purchases from all sources in the preceding year, or $2,790,327, whichever is greater.[7] The stated purpose of this restriction is "to prevent the defendants from exploiting Havatampa's market power as a wholesaler in order to increase the sales of Culbro cigars through Havatampa at the expense of other manufacturers' cigars."[8]

Section XI of the decree also prohibited Culbro for five years from the date of entry from increasing its equity interest in the Holding Company above the twenty-five percent level. This prohibition was considered by the Government "to be additional protection against the misuse of Havatampa's purchasing power to disadvantage competing manufacturers."[9] Section XI is the subject of the instant motion.

## II. The Chapter XI Proceeding.

Since entry of the consent judgment in July 1978, Eli Witt has experienced serious operational difficulties and financial reverses compelling it to reduce the number of its branch locations and to curtail its activities in other respects. In early 1979, Eli Witt was severely overextended: its cash flow was increasingly negative, and spiralling interest charges on its substantial outstanding loans further restricted the amount of available cash. By posting bonds with the relevant state agencies, Eli Witt had been able to purchase cigarette stamp taxes on credit. In May 1979, the insurance companies that bonded Eli Witt's payments of cigarette stamp taxes to the various taxing authorities threatened to cancel Eli Witt's bonds aggregating in excess of $10,000,000

3. 15 U.S.C. § 18.

4. *United States v. Culbro Corp.*, 1977–Trade Cases ¶ 61,514 (S.D.N.Y.1977).

5. The matter was referred to Judge Ward under the emergency rule. S.D.N.Y. Assignment & Calendar Rule 6(B)(2).

6. *United States v. Culbro Corp.*, 436 F.Supp. 746 (S.D.N.Y.1977).

7. The 12.9% limitation was based on the average ratio of Culbro cigars to all cigars purchased by Eli Witt during the years 1975–77, and represented the level of sales that Culbro made to Eli Witt prior to the time it acquired any interest in the company. The dollar purchase figure of $2,790,327 was equivalent to 80% of Eli Witt's purchases of Culbro cigars in 1977. Competitive Impact Statement at 6–7.

8. *Id.* at 6.

9. *Id.* at 8.

unless it furnished collateral security against any damages or payments required to be made under the bonds. They demanded acceptable letters of credit issued by responsible financial institutions. In the absence of the bonds, Eli Witt would have been required to purchase cigarette stamps from the various taxing authorities for cash, which would have further substantially reduced the funds available for day-to-day operations. Confronted by this deteriorating financial picture, on June 29, 1979, Eli Witt filed its Chapter XI petition. It has been in Chapter XI since that date. During the pendency of the proceeding, it carried on extensive negotiations for a reorganization plan with its creditors and the Creditors' Committee. The members of the Creditors' Committee represent the bulk of the unsecured creditors, including some of this nation's leading cigar manufacturers: American Brands, Inc., Bayuk Cigars, Inc., Consolidated Cigar Company and John H. Swisher & Company, all competitors of Culbro.

Eli Witt's financial problems worsened during its operation as a debtor-in-possession. Its third largest supplier of cigarettes abruptly cancelled its credit, requiring it to pay cash for its purchases. Other suppliers curtailed its credit by reducing the amount or by shortening the period of payment from the usual thirty days to twenty days or less. It now pays for cigarette tax stamps on a cash-in-advance basis rather than obtaining them on credit as it did prior to Chapter XI. The number of its distribution outlets was reduced from fifty-two in eight states to thirty in five states. Many cigar manufacturers who previously used Eli Witt as their exclusive distributor now sell their cigars either directly to retailers or through other distributors.

### III. The Proposed Plan.

Today Culbro, in addition to the $2,750,-000 of subordinated debentures of the Holding Company it holds, is a creditor of Eli Witt in excess of $1,000,000 for merchandise sold and management services rendered. Manufacturers Hanover is a secured credi-tor of both Eli Witt and the Holding Company in the amount of approximately $28,-000,000: $10,000,000 owed by the Holding Company and $13,000,000 by Eli Witt, with an additional $5,000,000 due in accrued interest. The total amount due to unsecured trade creditors is approximately $26,000,000 and in addition Eli Witt is liable for $9,000,-000 to its employees' pension fund.

After extensive negotiations with interested parties, Oppenheimer and Culbro have proposed a plan to restructure the debt of Eli Witt to permit it to continue in business on a contracted basis. Its unsecured creditors would receive fifty percent of their $26,000,000 in claims, with $4,300,000 to be paid upon confirmation of the plan and the remainder over the next ten years. In broad terms, the plan provides for the merger of Eli Witt with its parent, the Holding Company, with the result that Eli Witt would acquire all operating assets. Prior to the merger, under the plan the $3,500,000 of subordinated debentures of the Holding Company owned by Culbro and Oppenheimer are to be converted into equity securities so that (1) they are not liabilities or claims against the reorganized entity prior to or on a parity with claims of trade creditors, and (2) the reorganized entity will have a positive net worth to enable it to obtain future credit. Since the debentures currently owned by Culbro and Oppenheimer are those of the Holding Company, which has substantial assets including fixed assets used by Eli Witt in its operations, and are not the subject of any proceedings under the Bankruptcy Act, Culbro and Oppenheimer would give up debenture rights against the assets of the Holding Company and the debentures would be converted into preferred stock in the merged corporation subordinate to all Chapter XI debt. Under the plan, Culbro would not be entitled to receive any dividend on the preferred stock until all debts were paid off. Culbro would also waive payment of approximately $700,-000 against Eli Witt for management services rendered prior to the commencement of the Chapter XI proceeding.

Culbro is prepared to provide the necessary management to effect what is hoped to

be a successfully reorganized entity, despite its continuing heavy long-term debt burden. However, Culbro conditions its participation on its ability to acquire 100% of the capital stock of the reorganized company so that it can recoup its investment and participate in the anticipated profits of the reorganized entity in light of what Culbro conceives to be a long-term prospect of rehabilitation. Oppenheimer, wishing to liquidate its investment in Eli Witt, has proposed to grant Culbro a three-year option to purchase Oppenheimer's equity interest and debentures in the Holding Company for $600,000 payable over a two-year period. If Culbro exercises the option, $275,000 more is to be paid to Oppenheimer; if not, Culbro would surrender its existing option for twenty-five percent of the Holding Company's shares. The proposed plan has the approval of the Creditors' Committee, Culbro, Manufacturers Hanover and Oppenheimer, and the Committee has recommended its approval to the creditors. Prior to making the instant application, Culbro and Eli Witt sought to obtain the consent of the Department of Justice to the proposed modification, which was not forthcoming. Thereupon Culbro and Eli Witt brought on the present motion to modify Section XI of the consent decree.

Upon the initial hearing, the Government was afforded the opportunity to depose various witnesses, following which an evidentiary hearing was conducted at which other witnesses testified. The depositions were also presented as part of the record.

The Creditors' Committee has tabled a motion to have Eli Witt adjudicated a bankrupt pending the Court's determination of the requested modification, which is basic to the proposed reorganization plan. The Government opposes the modification on two grounds: (1) that permitting a 100% ownership of Eli Witt by Culbro presents the likelihood of a substantial lessening of competition in the wholesale distribution of cigars by the risk that other cigar manufac-

turers who wish to sell their products through the distribution houses owned by Eli Witt would be foreclosed from the southeastern market, and (2) that application of the "failing company" doctrine is not warranted. Since Culbro and Eli Witt are the movants, the burden of proof is on them with respect to these issues.[10]

## IV.  Potential Anticompetitive Effects.

As to the first ground of opposition, the Government's position is that despite its failing fortunes, Eli Witt's dominant position in significant areas of the Southeast has not changed substantially—that notwithstanding the reduction in distribution outlets, Eli Witt still has sixteen outlets in Florida, seven in Georgia, four in Tennessee, two in South Carolina, and one in Alabama, and remains a leading wholesale distributor in each of these areas. The Government also stresses that Culbro is still the "second or third" largest cigar manufacturer in the nation with eighteen to twenty percent of the total cigar sales. However, the Government admits that Culbro's distribution business is not conducted in the Southeast but is concentrated in the New York and Denver metropolitan areas—areas other than those in which Eli Witt operates.

The Government argues that the twenty-five percent limitation on Culbro holdings in Eli Witt contained in Section XI of the decree must remain intact as a prophylactic against potential anticompetitive effects. The argument is based on events subsequent to the entry of the decree which, despite the 12.9% limitation of Eli Witt's purchases of Culbro cigars and the 25% stock restriction, allegedly reflect anticompetitive results. The Government points out that since the decree, Culbro has been involved heavily in Eli Witt's management operations, has advised Eli Witt on financial matters, has supplied top executive and managerial personnel, and has handled the sale and liquidation of Eli Witt's unprofit-

**10.**  *Citizen Publishing Co. v. United States*, 394 U.S. 131, 138–39, 89 S.Ct. 927, 931–32, 22 L.Ed.2d 148 (1969).

able branches. The record is barren, however, of any direct proof that Culbro has interfered with or sought to influence Eli Witt to prefer or disfavor distribution of specified cigar brands.

The Government thus relies on indirect proof that four leading competitors of Culbro—American Brands, Bayuk, Consolidated and Swisher—have experienced a decline in Eli Witt's promotional activity for their products since entry of the decree. This decline is accompanied by a drop in Eli Witt's cigar purchases from these manufacturers in contrast to a simultaneous increase in cigar purchases from Culbro. The Government urges that this statistical disparity is attributable to Culbro's pervasive influence over Eli Witt's chief officers. It is contended that these officials, aware that Culbro's chief executive was instrumental in their hiring, as a matter of self-interest favor Culbro's products over those of its direct competitors.

To support the inference of favoritism and to demonstrate this statistical disparity, the Government in large measure relies on an exhibit contrasting Eli Witt's purchases from Bayuk, Consolidated and Swisher with those from General Cigar, Culbro's subsidiary, from 1977 to 1979.[11] While both sides rely on this chart, they draw different inferences from it. No clear picture emerges that would justify concluding that the drop in Eli Witt's purchases from Culbro's competitors during 1979 and the simultaneous rise in purchases from General Cigar is due to the role Culbro played in managing Eli Witt or Culbro's influence over Eli Witt's executives or other employees.

The inference that the Government seeks to draw from the bare statistical data must be tested against the total factual picture. The defendants point to another exhibit listing Eli Witt's total purchases since 1977 from eleven of its major cigar manufacturer-suppliers—including Bayuk, Consolidated, General Cigar and Swisher.[12] This exhibit demonstrates that while Eli Witt's purchases from Bayuk, Consolidated and Swisher dropped compared to those from General Cigar, other suppliers fared relatively well. Indeed, since, as the exhibit reveals, Eli Witt's purchases of General Cigar products remained a relatively constant percentage of Eli Witt's total cigar purchases—12.10% in 1977; 12.22% in 1978; and 13.01% in 1979—at no time exceeding the maximum under Section IX of the decree,[13] and since Eli Witt's total cigar purchases during this period remained relatively constant, any decrease in purchases from one cigar manufacturer was largely made up by increases in purchases from a manufacturer other than General Cigar. The Government does not explain why some manufacturers other than General Cigar experienced increased purchases from Eli Witt during this period.

The defendants further counter the statistical inference of favoritism for Culbro cigars by suggesting that other factors played a role in reducing Eli Witt's purchases from Culbro's three competitors. As already noted, Eli Witt's business has contracted substantially: sixteen of its distribution outlets have been sold or closed since the filing of the Chapter XI proceeding and four locations were closed prior to the filing. While Eli Witt remains an important and dominant distributor in the southeast, many cigar manufacturers, including some who once sold exclusively to Eli Witt in its

---

11. Plaintiff's Exhibit 7. The exhibit reflects Eli Witt's purchases and payments as entered in its books. If shipments to Eli Witt as entered in the manufacturers' books are examined, it appears that in 1978, the first year following the acquisition, General Cigar's sales to Eli Witt were down 1.7% from the prior year and in 1979 its sales decreased by 4.7%. For the first nine months of 1980, its sales to Eli Witt declined 28.9% from the equivalent period the previous year.

12. Bernstein Deposition, Exhibit 2A.

13. The 1979 figure is within the 12.9% limitation established by the decree because that limitation addresses current year purchases from Culbro (General Cigar) as a percentage of total Eli Witt purchases of the previous year. The 13.01% figure shown above, by contrast, reflects purchases from General Cigar as a percentage of total Eli Witt purchases of the current year.

areas of operations, now have substituted new channels of distribution. These manufacturers now can and do select from the seventy to seventy-five distributors, in addition to Eli Witt, that currently operate in the areas still serviced by Eli Witt. Eli Witt has lost major retail customers to these competing distributors and to the cigar manufacturers themselves who now often sell directly to retailers or chain stores. Moreover, even where Eli Witt still maintains distribution outlets, it has been forced by economic necessity to reduce inventory and to cut back on the number of salesmen it employs, routes it services, and retailers to whom it sells, with consequent loss of business. Similarly, a decline in sales has resulted from Eli Witt's reduced credit standing with many manufacturers, from the decision of several manufacturers to move from natural leaf tobacco wrapping to machine-made and less-popular reconstituted tobacco wrapping, and from the general "turmoil" in Eli Witt and the concomitant hampering of effective promotional efforts described by several witnesses. Depending upon the impact of these various market factors, Eli Witt's purchases from different manufacturers were affected differently. There is substantial testimony, for example, that the general decline experienced by the cigar industry in recent years has been felt most severely by the lower-priced cigar manufacturers. Thus, on balance, it appears that many factors, not attributable to any act or conduct of Culbro, may account for the drop in Eli Witt's purchases from Bayuk, Consolidated and Swisher. The greater probability is that Eli Witt's changed financial condition, the loss of its former credit standing, the reduction of its distribution outlets, the switch by its suppliers to direct distribution, the decrease in its routes and salesmen and the reduction of inventory, as well as other factors, were far more significant in the drop of Eli Witt's purchases from Bayuk, Consolidated and Swisher than any influence, direct or indirect, allegedly exerted by Culbro.

The Government also has failed to explain why if the twenty-year 12.9% limitation on Eli Witt's purchases from Culbro under Section IX of the decree was deemed sufficient in 1977 to avoid anticompetitive effects of Culbro's relationship to Eli Witt, that provision does not continue as an effective deterrent force for the balance of its term. The stated purpose of that provision, as previously noted, was to prevent Culbro from "exploiting Havatampa's [Eli Witt's] market power as a wholesaler in order to increase the sales of Culbro cigars through Havatampa at the expense of other manufacturers' cigars."[14] It has not been shown that its purpose has not been realized. The Government argues that Section IX cannot be considered in isolation—that the 25% limitation on Culbro's ownership of Eli Witt contained in Section XI was designed as an "additional protection" to prevent Culbro and Eli Witt from sharing an identity of interests and that keeping the ownership of Eli Witt substantially in the hands of others was intended to impede Culbro's manipulation of Eli Witt to favor its own General Cigar products. But as already mentioned, while the charge is made that Culbro's influence accounts for the drop in purchases from the three other suppliers examined, the evidence does not sustain the charge. It is more probable than not that the other factors adverted to above account for the drop. No evidence of past manipulation by Culbro has been presented and no basis exists to infer such manipulation in the future, even given the prospect of Culbro's full ownership of Eli Witt. Indeed, since Culbro acquired its interest in the company, Eli Witt has received letters from several leading cigar suppliers commending it for its promotional efforts on their behalf. The Government's case rests on conjectural considerations which, at most, reflect a mere possibility of a slight reduction in the market shares of Culbro's competitors caused by market and other factors unrelated to any influence of Culbro. This is insufficient to demonstrate a reasonable probability of a substantial lessening of competition.

14. Competitive Impact Statement at 6.

"[P]roof of a mere *possibility* of prohibited restraint or tendency to monopoly will not establish the statutory requirement that the effect of the acquisition 'may be' such restraint or tendency." [15]

Upon analysis of all pertinent factors, the proposed equity ownership of Eli Witt presents no clear picture of a probable substantial lessening of competition; indeed, the likelihood of such an impact is curtailed by the existing restraint on Eli Witt's purchases from General Cigar.

## V. Failing Company Doctrine.

■ Even if contrary to the foregoing it were found that Culbro's acquisition of the entire equity interest in Eli Witt presents anticompetitive effects—the risk that sales by other cigar manufacturers would be limited in the southeastern market—the Court considers the defendants' alternative application for relief under the "failing company doctrine." Under this doctrine, a proposed acquisition may be approved despite its anticompetitive effects if the resources of the target company are "so depleted and the prospect of rehabilitation so remote that it face[s] the grave probability of a business failure" and if no other prospective buyer can be found.[16] The Government contends that the defendants have failed to sustain their burden of meeting the standard enunciated by the Supreme Court in the seminal case of *United States v. Swift & Co.*,[17] that the changed circumstances relied upon are "so important that dangers, once substantial, have become attenuated to a shadow." [18]

To be sure, the mere insolvency of a company or its seeking refuge in a bankruptcy court does not by itself justify modifying an antitrust decree under this doctrine; otherwise, every bankrupt company against which an antitrust decree is outstanding would have an automatic basis for lifting the decree's restraint. The Government contends the defendants have failed to establish, in addition to Eli Witt's insolvency, (1) that they unsuccessfully sought reasonable, bona fide offers for the purchase of Eli Witt from companies other than Culbro, leaving Culbro as the only available purchaser, and (2) that the prospect of Eli Witt's rehabilitation under the bankruptcy laws is dim or nonexistent.

Considering the latter issue first, the Court finds the Government's position utterly unrealistic. The evidence is overwhelming that if the proposed plan of reorganization is not accepted, Eli Witt will be thrown into bankruptcy. The Government's position meets a sharp challenge from Eli Witt's largest trade creditor and a major competitor of Culbro, whose president, after appearing as a witness at the hearing, communicated to the Court by letter that "should the application of Culbro be denied, it is my belief that Eli Witt would most likely be liquidated." This view was shared by counsel to the Creditors' Committee in response to this Court's direct questioning of him at the hearing. All those vitally interested in the survival of Eli Witt appear to agree that refusal to permit Culbro to acquire the requested equity interest in Eli Witt in order to enable it to protect and recoup its investment will lead to the withdrawal of Culbro's offer. The Government's view that if the restraint on ownership is adhered to somehow a plan to rescue Eli Witt will still be forthcoming is sheer optimism. This optimism is predicated on a claim that Eli Witt's prospects of reorganization are not as dim as claimed— that to the contrary, its present status makes it an attractive investment. While it is true that since the filing of the Chapter XI proceeding Eli Witt's financial condition has improved somewhat, this is due in large measure to the forbearance of creditors,

---

**15.** *United States v. E.I. duPont Nemours & Co.*, 353 U.S. 586, 598, 77 S.Ct. 872, 880, 1 L.Ed.2d 1057 (1957) (emphasis in original).

**16.** *Citizen Pub. Co. v. United States*, 394 U.S. 131, 137–38, 89 S.Ct. 927, 930–31, 22 L.Ed.2d 148 (1969).

**17.** 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932).

**18.** *Id.* at 119, 52 S.Ct. at 464.

based solely on the prospect that the Culbro plan will be accepted, in not taking affirmative steps to terminate the Chapter XI proceeding by an adjudication in bankruptcy.

The Government also challenges the defendants' position that they have made reasonable efforts to find an alternative buyer for the Eli Witt stock, but this challenge is mere rhetoric. The fact is that Eli Witt's status is well known throughout the highly-concentrated cigar manufacturing industry and affiliated industries, as well as in investment circles. Included among its creditors and suppliers are the leading cigar manufacturers of the United States, all of whom have an interest in Eli Witt's survival. And yet, except for Culbro, which in addition to its position as a creditor, has a substantial investment in Eli Witt, no other offer to invest in Eli Witt so that it may continue as a viable force in the marketplace has been made by any responsible source. On the very eve of the hearing of this matter, Glaser Bros., one of the largest tobacco and confectionary distributors in the United States, was contacted by the Government and a representative testified at the hearing to "express a very high level of interest in the possible acquisition" of Eli Witt.[19] The fact remains that the vague generalization of "intense interest" by Glaser Bros. has never been translated into a viable offer; indeed, to this day, now more than a month since the start of the hearing on this application, no proposal by Glaser Bros. or any other responsible group has been made.

After the filing of the Chapter XI petition, a number of persons manifested interest and several discussed the prospect of investing in Eli Witt but, upon consideration, made no offer and declined to invest in the light of Eli Witt's heavy debt structure. The likelihood of a purchaser other than Culbro is a mere will-o'-the-wisp.

■ In sum, the Court finds that the parties have made a reasonable attempt to find an alternative purchaser for Eli Witt

but that despite it being well known in the industry and investment circles that Eli Witt was available for purchase, no other offer was forthcoming. Thus we reach the ultimate question, even assuming that some anticompetitive results may follow, should the stay be lifted? Essentially, this involves equitable considerations—an evaluation of the consequences of alternative judgment. "It is, in a sense, a 'lesser of two evils' approach, in which the possible threat to competition resulting from an acquisition is deemed preferable to the adverse impact on competition and other losses if the company goes out of business."[20]

The consequences that would follow a denial of lifting the restraint on Culbro's ownership cannot seriously be disputed. It may force Eli Witt into liquidation; unsecured trade creditors whose claims total $26,000,000 would realize only approximately five cents on the dollar, instead of the fifty cents on the dollar contemplated under the proposed Plan of Arrangement; 1,400 employees of Eli Witt would lose their jobs with adverse economic impact in the thirty communities where Eli Witt still does business; Eli Witt's unfunded pension liability would be some $9,000,000; and finally, Eli Witt would be eliminated from the relevant market as a substantial competitor. These adverse consequences weighed against what at most can be minimal anticompetitive consequences of the acquisition, compels the conclusion that equitable considerations justify lifting the restraint. Accordingly, the motion is granted, subject, however, to consideration of the application made by one creditor and by the Government that if the Court decides to lift the restraint that Article IX contain a further limitation upon the ground that its alternative dollar provision may operate as an unanticipated benefit to Culbro because of the contraction of Eli Witt's sales. The Court will hear interested parties on this request on Tuesday, January 6, 1981 at 2:15 p. m.

So ordered.

---

**19.** Hearing Record at 49.

**20.** *United States v. General Dynamics Corp.,* 415 U.S. 486, 507, 94 S.Ct. 1186, 1199, 39 L.Ed.2d 530 (1974) (footnote omitted).