**State of CALIFORNIA, Plaintiff,**

v.

**SUTTER HEALTH SYSTEM, Alta Bates Medical Center, and Summit Medical Center, Defendants.**

**No. C99–03803 MMC.**

United States District Court,
N.D. California.

Jan. 5, 2000.

John G. Donhoff, Jr., Attorney General, Thomas Greene, CA State Attorney General's Office, San Francisco, CA, for Plaintiffs.

Daniel M. Wall, Karen Silverman Johnson, Laura J. Zuckerman, McCutchen Doyle Brown & Enersen LLP, San Francisco, CA, Jeffrey A. LeVee, Jones Day Reavis & Pogue, Los Angeles, CA, Robert C. Jones, Kevin C. Maclay, George T. Manning, Toby G. Singer, Adrian Wager-Zito, Jones Day Reavis & Pogue, Washington, DC, L. Trammell Newton, Jr., Jones Day Reavis & Pogue, Atlanta, GA, for Defendants.

Maureen McGuirl, Crosby, Heafey, Roach & May, Los Angeles, CA, for Summit Medical Center.

## MEMORANDUM OF DECISION RE: ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION; FINDINGS OF FACT AND CONCLUSIONS OF LAW

CHESNEY, District Judge.

Before the Court is the motion of plaintiff State of California for preliminary injunction to enjoin the merger of defendant Alta Bates Medical Center ("Alta Bates"), owned by defendant Sutter Health System ("Sutter"), and defendant Summit Medical Center ("Summit"). The matter came on regularly for hearing on October 25, 26, 27, and November 1, 1999. Appearing for plaintiff State of California were Bill Lockyer, Attorney General of the State of California; John Donhoff, Jr., Deputy Attorney General; Pamela Cole, Special Deputy Attorney General and Charles M. McGay, Special Deputy Attorney General. Appearing for defendants Sutter and Alta Bates were George T. Manning, Robert C. Jones, Adrian Wager–Zito and Toby G. Singer, of Jones, Day, Reavis & Rogue. Appearing for defendant Summit was Maureen McGuirl of Crosby, Heafey, Roach & May. The matter was deemed submitted as of November 10, 1999, upon receipt of final post-hearing filings.[1]

---

1. Both plaintiff and defendants filed objec- tions to the post-hearing proposed findings of

Having considered the papers filed in support of and in opposition to the motion as well as the evidence and arguments of counsel presented at the hearing, the Court hereby issues the following findings of fact and conclusions of law and rules as follows:

## I. BACKGROUND

### A. Bay Area Health Care Market

#### 1. Hospitals

Defendants Summit and Alta Bates are hospitals located respectively in the cities of Oakland and Berkeley in Alameda County. Alameda County is located in what is commonly referred to as the East Bay, which in turn is part of the San Francisco Bay Area.

The East Bay includes the population centers located along the eastern side of the San Francisco Bay. The San Francisco Bay separates this population from Marin, San Mateo, and San Francisco counties, located to the west of the East Bay. Transportation across the San Francisco Bay in an east-west direction is confined to four bridges, one of which is the San Francisco–Oakland Bay Bridge (the "Bay Bridge"). The other bridges are located either to the north or south of San Francisco and Oakland. The Oakland and Berkeley hills separate the main population of the East Bay from the inland communities of the East Bay such as Walnut Creek and Concord in Contra Costa County. In the immediate Oakland/Berkeley area, transportation across the Oakland and Berkeley hills to these inland cities is limited to the Caldecott Tunnel. The East Bay is separated by the Carquinez Strait from Solano County to the north.

A wide variety of hospitals exist in the San·Francisco Bay Area, and range from general acute care hospitals such as John Muir Medical Center ("John Muir") in Walnut Creek, which offers a full range of primary, secondary, and tertiary care,[2] to specialized hospitals such as Children's Hospital in Oakland, which offers only pediatric services. The size and capacity of the hospitals in the Bay Area also vary widely, from Alameda Hospital, located on Alameda Island, which maintains 135 licensed beds, to Laguna Honda Hospital & Rehabilitation Center in San Francisco, which maintains 1,457 licensed beds.

At least twenty hospitals, including defendants Summit and Alta Bates, are located in the East Bay. (Defs.' Ex. 1001, Economic Report of Margaret E. Guerin–Calvert (Defendant's Expert) ¶¶ 26, 42 & Tab I.) Alta Bates, the second largest hospital in the East Bay with over 500 licensed beds, is a comprehensive community hospital that enjoys a reputation for quality health care services. Alta Bates is a general acute care hospital that offers a wide range of primary, secondary, and tertiary services, and is the sole provider of high-risk obstetrical services in Alameda County. (PX 1082, Langenfeld Report, Ex. 2.)

Sutter, a nonprofit corporation based in Sacramento, California, currently operates twenty-six hospitals in Northern California, and is the largest operator of general acute care hospitals in Northern California. Sutter entered the San Francisco and

---

fact and conclusions of law submitted by the opposing parties in connection with the present motion. To the extent that these objections concern matters addressed at the hearing conducted on October 22, 1999, the Court relies on its earlier rulings. To the extent defendants object to evidence in plaintiff's post-hearing proposed findings of fact not included in plaintiff's original proposed findings of fact, the Court finds that such evidence was appropriately included in plaintiff's post-hearing papers. With regard to plaintiff's hearsay objections, the Court sustains to the extent the subject evidence is not derived from business records.

**2.** The services offered by hospitals are often grouped into three general categories. Primary services include basic hospital services such as obstetrics, general medicine, and general surgery involved in relatively simple procedures. Secondary services are more complex and require more specialized equipment and personnel. Tertiary services involve the most complex and highly specialized services such as heart bypass surgery and transplants.

East Bay health care market through its acquisition of California Healthcare System in 1996 and currently operates six hospitals in the San Francisco Bay Area, including Eden Medical Center ("Eden") in Castro Valley, with over 250 licenced beds, and Alta Bates in Berkeley. (PX 1082, Langenfeld Report, Ex. 4, 57.)

Summit, also a nonprofit corporation, was formed in 1992 by the merger of two Oakland hospitals, Providence Hospital and Merritt Peralta Medical Center. Summit is comprised of five separately incorporated entities: Summit Hospital (the "Hospital"); Health Ventures, Inc., which owns Summit Health Clinic, an outpatient clinic; Adolescent Treatment Centers, Inc., a substance abuse program; Samuel Merritt College, a nursing college; and Summit Medical Center Foundation (the "Foundation"), a charitable foundation.

Summit Hospital is a general acute care hospital in an inner-city neighborhood of Oakland, located approximately three miles from Alta Bates. Summit also offers a wide range of inpatient and outpatient services and is currently the third largest hospital in the East Bay with over 500 licensed beds. (PX 1082, Langenfeld Report, Ex. 57.) Summit tends to charge lower rates than Alta Bates, and its patient mix includes a large percentage of Medicare and Medi-Cal (the California equivalent of Medicare) patients. (PX 1082, Langenfeld Report, Ex. 2.)

The largest hospital in the East Bay is Alameda County Medical Center ("ACMC"). Located in the Berkeley/Oakland area, ACMC maintains over 600 licensed beds and primarily provides medical services to indigent and low-income residents of Alameda County. ACMC offers most primary and secondary services plus some, but not all, tertiary services. (PX 1082, Langenfeld Report, Ex. 2; PX 15, Decl. of Michael Smart (CEO, ACMC) ¶¶ 2–6, 8.)

Also located in Oakland is Kaiser Hospital–Oakland ("Kaiser–Oakland"), operated by the Kaiser Foundation Health Plan ("Kaiser"). Kaiser–Oakland maintains 394 licensed beds and offers a full range of acute inpatient services comparable to those offered at Alta Bates and Summit. Kaiser–Oakland has been scheduled to close due to the expense of seismic upgrades required under the Alquist Hospital Safety Act of 1983 (the "Alquist Act"). Cal. Health & Safety Code § 130000 et seq. (Deering 1997). (PX 20, FTC Transcript of Jerry Fleming (Senior VP, Kaiser Permanente), May 4, 1999, at 56:15–19.) In connection with the scheduled closing, Kaiser has contracted to send its patients to other hospitals under what has been termed the "Alameda Alliance". Kaiser has been sending patients for inpatient obstetrical services, mainly childbirth, to Alta Bates. Kaiser has also executed contracts with Summit for adult non-obstetrical medical/surgical services, and with Children's Hospital for pediatric services. (PX 20, Fleming Tr. at 46:9–25.) In April 1999, Kaiser requested a "standstill" agreement to defer implementation of its contracts with Summit, as discussed below. Kaiser also operates two other hospitals in the East Bay: Kaiser–Richmond with 50 licensed beds, and Kaiser–Hayward with 244 licensed beds.

Approximately thirty miles to the south of Alta Bates and Summit at the outer edge of the East Bay lies Washington Township Hospital ("Washington Township") in Fremont, which maintains 308 licensed beds and offers services comparable to Alta Bates and Summit. Washington Township recently opened a new building with expanded cardiac and pulmonary services, and is located in an area with a growing population. (Def.'s Ex. 995, Dep. of Kimberly Hartz at 81–87.)

Eight hospitals are located on the Contra Costa County side of the Caldecott Tunnel, east of Summit and Alta Bates, and within the general East Bay area. (Def.'s Ex. 916.) John Muir in Walnut Creek, for example, maintains 327 licensed beds and is a sophisticated regional medical center that offers, as noted above, a full

range of primary, secondary, and tertiary care similar to the services offered at Summit and Alta Bates. (Def.'s Ex. 119 at BLUECR0000025; PX 1082 Langenfeld Report, Ex. 3.) John Muir has a stated strategy of expanding "outside of [its] core service area," and has recently received approval for an 833,000 square foot addition to its facilities. (PX 57, John Muir/Mt. Diablo Strategic Plan 1998–2001, Nov. 11, 1997, at JMMDH5005283; Def.'s Ex. 1029, *City Approves John Muir Master Plan,* Walnut Creek Journal, Jan. 22, 1998 at 1.). In 1997, John Muir merged with Mount Diablo Medical Center ("Mount Diablo"), located in Concord, also through the Caldecott Tunnel, which currently maintains 254 licensed beds. Mount Diablo offers a variety of acute inpatient services and its areas of distinction include cardiac care, oncology services, and obstetrics. (PX 1082, Langenfeld Report, Ex. 3.)

At least nine hospitals are located in San Francisco, across the Bay Bridge from Summit and Alta Bates. (Def.'s Ex. 916.) Many of these hospitals, such as the University of California San Francisco/Mount Zion Medical Center, offer a wide variety of high quality health care services at least comparable to those offered at Alta Bates and Summit.

## 2. Health Groups

The Bay Area is characterized by strong, sophisticated health care plans. Managed care organizations ("MCOs") in the East Bay cover nearly 60% of the population, one of the highest levels in the country. (Def.'s Ex. 1013, Expert Report of Michael Pugh ¶ 44; Def.'s Ex. 997, Dep. of Warren Foon at 56; Def.'s Ex. 982, Dep. of Richard Scheffler at 67–68.) Managed care, which has increasingly taken the place of traditional indemnity-based insurance, can be defined as a system in which the financing and delivery of health care is integrated to achieve the goals of disease prevention and efficiency in the provision of health care services. (Def.'s Ex. 1013, Pugh Report ¶ 7.)

There are three broad types of MCOs. Health maintenance organizations ("HMOs") integrate the financing and delivery of a comprehensive set of health care services to an enrolled population which must obtain medical care from within the HMO network of health care providers. Such services are generally offered on a "capitated" or flat monthly-fee basis with low or no co-payments instead of through deductibles and claim forms. There is generally no coverage, however, for services from providers outside of the HMO network. Preferred provider organization insurance plans ("PPOs") are fee-for-service health care benefit plans built on indemnity insurance platforms which offer financial incentives to enrollees to acquire medical care from a predetermined ("preferred") network of physicians. Finally, HMO point-of-service ("POS") plans allow members to go outside of the HMO network for health care services. Care is managed in a traditional HMO fashion within the HMO network, but if a member seeks care outside the HMO network, the plan levies significant out-of-pocket costs on members in the form of deductibles and co-payments similar to a PPO. (Def.'s Ex. 1013, Pugh Report ¶ 17.)

By far the largest health care plan in the Bay Area is Kaiser, with more than 800,000 members. Kaiser currently covers 40% of the insured population and enjoys a 50% share of health plan enrollment in the East Bay. (Def.'s Ex. 1001, Guerin–Calvert Report ¶ 30.) Kaiser is distinct from other HMOs in the market because it is a "vertically integrated" health care system, meaning that member patients are generally required to use Kaiser physicians and Kaiser hospitals, and Kaiser hospitals primarily serve only those patients that are enrolled in the Kaiser health plan. (PX 1082, Langenfeld Report at 46.) The second largest health plan in the East Bay, in terms of membership volume, is Health Net, with 185,000 members. Other health plans include PacifiCare, Aetna, Lifeguard, CIGNA, Blue Cross, and Blue Shield. (Def.'s Ex. 379, Deloitte & Touche Consulting, Materials for August 12, 1998 Alta Bates/Summit meeting at SUT0781660; Def.'s Ex. 494, List of Companies Provid-

ing HMO and PPO Products in the East Bay at 003941.)

The Bay Area, unlike many other areas of the country, is also characterized by the existence of numerous large, well-organized, and competitive Independent Practice Associations ("IPAs"). An IPA is a separate legal entity that has been formed by independent physicians and small medical groups that band together, much like a co-op, to enter into contracts, which typically include risk-sharing arrangements, directly with health care plans. (Hr'g Tr. at 509:8–13, 180:8–181:7; Def.'s Ex. 1013, Pugh Report ¶¶ 56–57; Def.'s Ex. 989, Dep. of Steve McDermott at 19–20.) Risk-sharing arrangements give physicians incentives to admit patients to lower-cost hospitals because physicians can share in cost savings if they do not expend all of the money received from the insurance companies. (Hr'g Tr. at 509:8–13; Def.'s Ex. 1013, Pugh Report ¶¶ 56–57; Def.'s Ex. 989, McDermott Dep. at 19–20; Def.'s Ex. 982, Scheffler Dep. at 72–74.) IPAs in the East Bay include Hill Physicians Medical Group, Alta Bates Medical Group, Affinity Medical Group, San Leandro IPA, John Muir Health Network, and West County IPA, among others. (Def.'s Ex. 37, Presentation Materials Re: East Bay Services Area at SUT0230887.)

In recent years, consolidation among various health care plans, such as the 1998 mergers of Foundation Health of California with Health Net, and CareAmerica Health Plans with CaliforniaCare, in addition to the strong emergence of IPAs, have led to a very competitive environment in the health care market, and the pressure to reduce costs have resulted in significant financial pressure on health plans and providers throughout California. (Def.'s Ex. 1013, Pugh Report ¶¶ 49–50.)

**B. Merger Discussions**

In 1995, Summit began a process of seeking potential purchasers. Summit

participated in acquisition negotiations with Catholic Healthcare West ("CHW") and retained an investment banking firm, Morgan Stanley Dean Witter ("Morgan Stanley"), to identify other possible affiliation partners. (Def.'s Ex. 811, Decl. of John Q. Landers, Managing Director, Morgan Stanley, ¶ 4.) In consultation with Morgan Stanley, Summit developed a proposal process for potential partners and, in February 1997, distributed an Offering Memorandum to the entities it had identified as potentially interested in acquiring Summit. (Def.'s Ex. 811, Landers Decl. ¶¶ 5–6.)

In March and April 1997, Morgan Stanley received preliminary proposals from CHW, Columbia/HCA, Sutter, and Tenet Healthcare Corporation ("Tenet"). CHW's bid was eliminated by Summit's Board and Columbia/HCA subsequently decided not to pursue the acquisition of Summit for internal reasons. (Dep. of John Landers at 15:16–20, 18:1–14, 45:17–25, 46:1–8.) Therefore, by November 1997, the Summit Board had narrowed the field of potential acquirers to two candidates: Tenet and Sutter.

Morgan Stanley and Summit management negotiated with Sutter and Tenet from December 1997 to March 1998, at which time the Summit Board decided to accept Sutter's offer. By agreement dated November 19, 1998, as amended on December 11, 1998, Sutter and Summit agreed to merge the Summit and Alta Bates facilities into a single hospital business providing primary, secondary, and tertiary inpatient care. (Pl.Mot. at 6, Ex. 67; Def.'s Ex. 810, Decl. of Irwin Hansen ¶ 31.) The merger was to be consummated on August 11, 1999, but has been postponed pending the resolution of the present action.

**C. Summit Financial Situation**

In fiscal year 1996,[3] when Summit first began to enter into merger negotiations,

---

3. Summit's fiscal year ends on February 28 or 29. Thus, fiscal year 1996 encompasses

March 1, 1995 through February 28, 1996.

and in fiscal year 1997, as negotiations continued, Summit enjoyed an operating income of $4.4 million and $4.5 million respectively. In fiscal year 1998, Summit's financial situation began to deteriorate and Summit sustained an operating loss of $400,000. In fiscal year 1999, Summit's losses increased to $10.9 million, and as of August 31, 1999, the hospital's operating income losses amounted to $5.3 million. (Def.'s Ex. 809, Decl. of Vic Meinke ¶ 17; Hr'g Tr. at 594:13–595:18.)

A major reason for Summit's deteriorating financial condition is the enactment of the Balanced Budget Act of 1997 (the "Budget Act"), which reduced Medicare payments to hospitals. Government payers account for a significant portion of Summit's revenues. In Fiscal Year 1999, Medicare accounted for 53.1% of its revenue (excluding charity care) and Medi–Cal accounted for 21%. (Def.'s Ex. 809, Meinke Decl. ¶ 9.) Therefore, despite the fact that patient volumes have increased slightly over the last two fiscal years—up 8% since fiscal year 1997—and cost cutting measures have kept Summit's costs at or below local and national norms, Summit's patient revenue per adjusted discharge over the last two fiscal years has declined by 8.4%. (Hr'g Tr. at 779:19–780:15; Def.'s Ex. 826, Expert Report of R. Bruce Den Uyl at 11–12.) As estimated by Ernst & Young, an accounting firm, the Budget Act will reduce Summit's revenues by at least $52.8 million in fiscal years 1999–2002. (Def.'s Ex. 809, Meinke Decl. ¶¶ 19–20; Def.'s Ex. 810, Hansen Decl. ¶¶ 16–17.)

Due to the Budget Act and other factors, Summit has not been able to generate sufficient cash from its operations to meet its obligations. Consequently, Summit has been expending its cash and short-term investments in addition to monies classified as "Board Designated–Plant Fund Assets" ("Plant Fund") in order to pay its trade debts. (Def.'s Ex. 826, Den Uyl Report at 12.) The Plant Fund consists of funds set aside by the Board of Directors for specific capital improvement projects in order to keep the hospital competitive in technology, equipment, and facilities.

(Def.'s Ex. 809, Meinke Decl. ¶ 26.) The Plant Fund has been depleted at a rapid rate. At the end of February 1999, the Plant Fund contained $10.8 million. (Def.'s Ex. 707, at C–3.) By the end of August 1999, the Fund had decreased to $2.3 million (Def.'s Ex. 772, Summit Med. Center—Summary Stat. Info. at SUM05002021.)

An additional source of funding is the Uncompensated Care Fund, which consists of monies donated to Summit to provide care for needy patients. Currently, $7 million of the $10.5 million fund is available to offset losses. It is anticipated that amount will be exhausted by December 1999. (Hr'g Tr. at 777:1–17; 783:2–4.) The balance of the Uncompensated Care Fund will likely become fully available for expenditure by the end of February 2000. Even with this amount, however, and funds from Kaiser under the Capital Funding Agreement, as discussed below, Summit will only be able to operate for one or two additional months past February 2000 before it runs out of cash. (Hr'g Tr. at 777:1–7.)

At the end of February 1999, Summit was unable to pay over $6.4 million in vendor's bills that were due and payable. As of September 30, 1999, the amount of overdue bills has increased to $8.9 million. Because Summit has not been paying its debts as they come due, some suppliers have placed it on "cash-on-delivery" payment terms. (Def.'s Ex. 809, Meinke Decl. ¶ 22; Def.'s Ex. 826, Den Uyl Report at 6.)

Summit also has a large amount of long-term debt. Summit borrowed the proceeds of tax-free revenue bonds ("Revenue Bonds") issued by the California Health Facilities Financing Authority in 1985. This debt was refinanced in 1989 and again in August 1996 through the proceeds of bonds issued by the Health Facilities Financing Authority. The total amount of bonds issued in 1996 was $75.92 million and the outstanding balance as of August 1999 was $68.7 million. (Def.'s Ex. 809, Meinke Decl. ¶ 29.) The Revenue Bonds

contain covenants that restrict Summit's ability to take on additional debt if Summit's debt-service coverage ratio falls below 1.35. Summit's present debt-service ratio is 0.62, less than half the required ratio. (Def.'s Ex. 809, Meinke Decl. ¶ 31.) By the close of this fiscal year, Summit will be unable to satisfy the debt service ratio requirement without shutting down substantial portions of the hospital. (Def.'s Ex. 826, Den Uyl Report at 18.)

Summit faces significant expenditures related to the seismic upgrades required by the Alquist Act and that all inpatient hospital facilities must complete by 2008 or 2030, depending on the nature of the upgrade. Much of Summit's physical plant does not meet these seismic mandates and, based on square footage, over 47% of Summit's inpatient facilities need to be upgraded to meet the state seismic mandates. The expected costs of making the required structural and non-structural improvements is estimated to total approximately $109.7 million. (Def.'s Ex. 809, Meinke Decl. ¶¶ 34–35.) The required structural expenditures, which exceed the book value of the assets themselves, $103 million, have contributed to a fair market value of these assets at significantly below book value as reflected on Summit's balance sheet. (Def.'s Ex. 809, Meinke Decl. ¶¶ 34–35.)

In addition to the mandatory seismic upgrades, Summit has also been required to upgrade its facilities pursuant to contracts entered into with Kaiser. In April 1998, Kaiser and the Permanente Medical Group, based on Kaiser's decision to close Kaiser–Oakland, entered into a Hospital Services Agreement and a Capital Funding Agreement with Summit. Under the Hospital Services Agreement, Kaiser agreed, excepting pediatric and Ob/Gyn cases, to transfer patients to Summit that normally would have been treated at Kaiser–Oakland. (Def.'s Ex. 810, Hansen Decl. ¶ 21; Def.'s Ex. 809, Meinke Decl. ¶ 48.)

To accommodate this increase in patients under the Hospital Services Agreement, Summit was required to expand and renovate some of its buildings. Specifically, Kaiser required that Summit complete seismic upgrades to two wings before Kaiser would transfer any patients. Under the Capital Funding Agreement, Kaiser advanced most of the funding for these capital expenditures. The loans under this agreement are to be repaid by credits against the invoices that Summit would submit to Kaiser for services provided under the Hospital Services Agreement. (Def.'s Ex. 809, Meinke Decl. ¶¶ 49–50.) The Kaiser construction was estimated to cost $49.7 million, of which Kaiser agreed to fund $33.5 million for construction and equipment and up to $5 million for seismic upgrades, while Summit bore responsibility for $11.2 million in construction costs. (Def.'s Ex. 809, Meinke Decl. ¶ 51.) The Kaiser upgrades have not yet been completed. Summit's Emergency Room, for example, remains under construction and its condition has led regulators to caution Summit that construction of the Emergency Room must be completed soon. (Def.'s Ex. 809, Meinke Decl. ¶¶ 43–44.)

In April 1999, Kaiser requested a "standstill" agreement which would defer implementation of the Hospital Services Agreement while Kaiser considered options other than closing Kaiser–Oakland and sending its patients to Summit. (Def.'s Ex. 810, Hansen Decl. ¶ 25.) Kaiser Chairman, David Lawrence, however, testified during the FTC investigation of the proposed merger that he believes that the Hospital Services Agreement will not be breached and Kaiser–Oakland will certainly close within three years and perhaps as soon as one year. (PX 32, Statement of David Lawrence (Chairman, Kaiser Permanente) at 55:10–56:2.) Summit estimates that the amount to be paid for work previously undertaken and to complete the construction projects, on a modified basis if Kaiser will not implement the Hospital Services Agreement, will be at least $11.7 million. (Def.'s Ex. 809, Meinke Decl. ¶¶ 43–44.)

## II. LEGAL STANDARD

### A. Preliminary Injunction

On August 10, 1999, plaintiff State of California, represented by its Attorney General, Bill Lockyer, filed this action in its *parens patriae* capacity for injunctive relief under Section 7 of the Clayton Act. *See* 15 U.S.C. § 26 ("Any person, firm corporation, or association shall be entitled to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws...."). *See Hawaii v. Standard Oil Co.*, 405 U.S. 251, 261, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972) (recognizing *parens patriae* standing under the Clayton Act for injunctive relief).

■ To obtain a preliminary injunction, a plaintiff "must show either (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips sharply in its favor." *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 174 (9th Cir.1987). As explained by the Ninth Circuit, "[t]hese formulations are not different tests but represent two points on a continuum in which the degree of irreparable harm that must be shown increases as the probability of success on the merits decreases." *Oakland Tribune, Inc. v. Chronicle Publishing Co.*, 762 F.2d 1374, 1376 (9th Cir.1985).

### B. Clayton Act

■ Section 7 of the Clayton Act prohibits mergers or acquisitions "in any line of commerce or in any activity affecting commerce in any section of the country, [where] the effect of such acquisition may be substantially to lessen competition or to tend to create a monopoly." 15 U.S.C. § 18. Section 7 was enacted to prevent anticompetitive mergers "in their incipiency." *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 362, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1962). Therefore, "[a]ll that is necessary [under Section 7] is that the merger create an appreciable danger of [anticompetitive] consequences in the future. A predictive judgment, necessarily probabilistic and judgmental rather than demonstrable, is called for." *Hosp. Corp. of America v. Fed. Trade Comm'n*, 807 F.2d 1381, 1389 (7th Cir.1986).

■ To establish a prima facie case under Section 7 of the Clayton Act, a plaintiff must first define the relevant market, and then establish that the proposed merger will create an appreciable danger of anticompetitive consequences. *Philadelphia Nat'l Bank*, 374 U.S. at 362, 83 S.Ct. 1715. The relevant market consists of two components, the "product market," and the "geographic market". *See United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 618, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974) ("Determination of the relevant product and geographic markets is a 'necessary predicate' to deciding whether a merger contravenes the Clayton Act."); *Fed. Trade Comm'n v. Staples, Inc.*, 970 F.Supp. 1066, 1072 (D.D.C.1997) (holding elements of prima facie. case for violation of Section 7 are: "(1) the 'line of commerce' or product market in which to assess the transaction; (2) the 'section of the country' or geographic market in which to assess the transaction; and (3) the transaction's probable effect on competition in the product and geographic markets").

■ After defining the relevant market, a plaintiff may establish a presumption that the proposed merger will substantially lessen competition by making an initial statistical showing that the transaction will lead to undue concentration in the market. *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 982 (D.C.Cir.1990). *See also State of California v. American Stores Co.*, 872 F.2d 837, 842 (9th Cir.1989), *rev'd on other grounds*, 495 U.S. 271, 110 S.Ct. 1853, 109 L.Ed.2d 240 (1990) ("Statistics that indicate excessive post-merger market share and market concentration create a presumption that the merger violates the Clayton Act."); *United States v. Syufy*, 903 F.2d 659, 664 n. 6 (9th Cir.1990) (holding evidence of high market share establishes prima facie case).

■ If the plaintiff successfully establishes a presumption of anticompetitive effect through market-share statistics, "[t]he burden of producing evidence to rebut this presumption then shifts to the defendants." *Baker Hughes,* 908 F.2d at 982. *See also Marine Bancorporation,* 418 U.S. at 631, 94 S.Ct. 2856 ("To meet this burden, the defendants must show that the market-share statistics give an inaccurate prediction of the proposed acquisition's probable effect on competition."); *American Stores,* 872 F.2d at 842 (holding defendant may rebut prima facie case by "demonstrating that statistics on market share, market concentration, and market concentration trends portray inaccurately the merger's probable effects on competition"). Finally, upon a defendant's successfully rebutting the presumption of anticompetitive effect, "the burden of producing additional evidence of anticompetitive effect shifts to the [plaintiff] and merges with the ultimate burden of persuasion, which remains with the [plaintiff] at all times." *Baker Hughes,* 908 F.2d at 982, *citing to Kaiser Aluminum & Chem. Corp. v. Fed. Trade Comm'n,* 652 F.2d 1324, 1340 n. 12 (7th Cir.1981).

## III. ANALYSIS

### A. Product Market

■ The first step in analyzing the competitive effects of a merger under Section 7 of the Clayton Act is to define the relevant product market. In *Brown Shoe v. United States,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), the Supreme Court set forth the rule for determining the product market, stating "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Id.* at 325, 82 S.Ct. 1502. Product markets are defined by the ability of consumers economically to switch from one product or service to a substitute. A properly defined product market consists of all goods or services "reasonably interchangeable by consumers for the same purposes." *United States v. E.I. du Pont de Nemours*

*& Co.,* 351 U.S. 377, 395, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). *See also Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.,* 875 F.2d 1369, 1374 (9th Cir.1989) (holding the relevant product market to include "the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business.") (citations omitted).

■ In the present case, the parties agree that the relevant product market consists of the cluster of services comprising acute inpatient care. (Hr'g Tr. at 1070.) While the treatments offered to patients within this cluster of services are not substitutes for one another (for example, one cannot substitute a tonsillectomy for heart bypass surgery), the services and resources that hospitals provide tend to be similar across a wide range of primary, secondary, and tertiary inpatient services. Accordingly, courts have consistently recognized the cluster of services comprising acute inpatient services as the appropriate product market in hospital merger cases. *See United States v. Long Island Jewish Medical Center,* 983 F.Supp. 121, 138 (E.D.N.Y.1997) (noting weight of authority in hospital merger cases supports use of general acute inpatient services as appropriate product market); *Santa Cruz Medical Clinic v. Dominican Santa Cruz Hosp.,* 1995 WL 853037 at *5 (N.D.Cal. 1995) (noting near unanimity in applying cluster market concept to inpatient care in hospital merger cases).

This product market includes not only services provided by hospitals that offer the full range of general acute inpatient services, but also those available at "niche" hospitals, such as Children's Hospital, that compete with Sutter and Alta Bates in providing only part of the "cluster of services" that constitutes general acute inpatient care. *See Forsyth v. Humana, Inc.,* 114 F.3d 1467, 1476 (9th Cir.1997) ("Specialty shops which offer only a limited range of goods are generally considered in the same market with larger, more diverse, 'one-stop shopping' centers.").

Although the parties agree that the proper product market consists of the cluster of services comprising acute inpatient care, they disagree as to whether the services provided by Kaiser hospitals should be included in this market.

Plaintiff argues that the Kaiser hospitals should be excluded from the product market because Kaiser's services are "captive" in that Kaiser hospitals generally only provide care to Kaiser members. Therefore, plaintiff contends, the Kaiser hospitals do not provide a practical alternative for non-member consumers of acute inpatient services.

All forms of acute inpatient care, however, are substitutes for the services offered by defendants because they all accomplish the task of delivering acute inpatient services to patients in the Bay Area. *See* United States Dept. of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines,* 4 Trade Reg.Rep. (CCH) ¶ 13, 104, at § 1.31 (1992 with 1997 revisions) ("*Merger Guidelines* ") (including products and services offered by vertically integrated firms in product market). Although Kaiser hospitals may not directly provide services to non-member patients, they do provide viable substitutes for services offered at other hospitals in the region; if faced with an anticompetitive price increase, patients may choose to join the Kaiser network for acute inpatient services. As a leading treatise explains, "[i]nternal or captive transfers of a product should be included in the market. It is a part of supply, and control over supply determines the existence of market power. . . ." Areeda & Hovenkamp, *Antitrust Law,* IIA § 570g (1995) ("Areeda"). *See also Reazin v. Blue Cross and Blue Shield of Kan., Inc.,* 899 F.2d 951, 959 n. 10 (10th Cir.1990) (holding "self-insurance" is part of market for private health care financing). Accordingly, the Court finds the Kaiser hospitals to be part of the relevant product market.

### B. Geographic Market

#### 1. Legal Standard

After defining the relevant product market, the plaintiff bears the burden of proving the proper geographic market in which to analyze the competitive effects of the proposed merger. *United States v. Connecticut Nat'l Bank,* 418 U.S. 656, 669, 94 S.Ct. 2788, 41 L.Ed.2d 1016 (1974). The proper geographic market is "that geographic area 'to which consumers can practically turn for alternative sources of the product and in which the antitrust defendants face competition.' " *Fed. Trade Comm'n. v. Freeman Hosp.,* 69 F.3d 260, 268 (8th Cir.1995) (citations omitted). A determination of the proper geographic market must be based on the "commercial realities of the industry," *Brown Shoe,* 370 U.S. at 336, 82 S.Ct. 1502, and therefore, must involve a dynamic as opposed to static analysis of "where consumers could practicably go, not on where they actually go." *Freeman Hosp.,* 69 F.3d at 268. *See also Fed. Trade Comm'n v. Tenet Health Care Corp.,* 186 F.3d 1045, 1052 (8th Cir. 1999) (A "properly defined geographic market includes potential suppliers who can readily offer consumers a suitable alternative to the defendant's services."). Although the geographic market must be "well-defined," courts do not compel "scientific precision" in its definition. *Connecticut Nat'l Bank,* 418 U.S. at 669, 94 S.Ct. 2788.

The *Merger Guidelines,* set forth the standards by which the Federal Trade Commission decides whether or not to challenge a merger, and define a geographic market to be the smallest region "such that a hypothetical monopolist that was the only present or future producer of the relevant product at locations in that region could profitably impose at least a 'small but significant and nontransitory' increase in price ["SNIP"], holding constant the terms of sale for all products produced elsewhere." *Merger Guidelines* at § 1.21. Although the *Merger Guidelines* are not binding, courts have often adopted the standards set forth in the *Merger*

*Guidelines* in analyzing antitrust issues. *See Tenet,* 186 F.3d at 1053 (referencing *Merger Guidelines* analysis in evaluating geographic market); *United States v. Mercy Health Services,* 902 F.Supp. 968, 980 (N.D.Iowa 1995) (utilizing *Merger Guideline* SNIP analysis in determining geographic market).

## 2. Current Market Analysis: Elzinga–Hogarty Test

### a. Service area analysis

The basic question to be asked in determining the relevant geographic market is where can patients practicably go for acute inpatients services. *Freeman Hosp.,* 69 F.3d at 268. The first step in answering this question is to determine where patients currently go for acute inpatient services. *See Fed. Trade Comm'n v. Freeman Hosp.,* 911 F.Supp. 1213, 1217 (W.D.Mo.1995) ("The first step in evaluating the relevant geographic market is to determine where the patients of [defendants] come from."). The analytical process generally begins with an application of the Elzinga–Hogarty test ("E–H test"), a two-part test which examines current market behavior through an analysis of hospital service areas and patient flow data. *See Mercy Health,* 902 F.Supp. at 978 ("[T]he Elzinga–Hogarty test is ... a starting point—it states where [the merging hospitals] are currently attracting patients...."). 

As explained by the Eighth Circuit in *Freeman Hosp.,* 69 F.3d at 263, "[t]he first prong of the Elzinga–Hogarty test requires a determination of the merging hospitals' 'service area,' that area from which they attract their patients." In the second step, two measurements are taken of the flow of patients into and out of the test market. The Little In From Outside ("LIFO") measurement calculates the percentage of patients who reside inside the test market that are admitted to those hospitals located within the test market.

A LIFO of 100% would indicate that all hospital admittees in the test market are residents of the test market. The Little Out From Inside ("LOFI") measurement calculates the percentage of patients who reside in the test market who obtain inpatient services from the hospitals in the test market A LOFI of 100% would indicate that all hospital patients who are residents of the test market are admitted to hospitals in the test market. A LIFO and LOFI of 75% is considered a weak indication of the existence of a market and a LIFO and LOFI of 90% is considered a strong indication of a market.

Plaintiff's economic expert, James Langenfeld, Ph.D., performed a geographic market analysis. Dr. Langenfeld, however, did not begin his analysis with an examination of hospital service areas as prescribed by the E–H test methodology. Instead, he first examined the geography of the Bay Area and the perceptions of market participants to arrive at a proposed geographic market consisting of what plaintiff describes as the "Inner East Bay", encompassing the area between the San Francisco Bay on the west and the Caldecott Tunnel on the east, and running from the Carquinez Strait in the north to Union City in the south. (PX 1082, Langenfeld Report at 4.)

After proposing this market, Dr. Langenfeld proceeded to determine the service area of Summit and Alta Bates through a methodology that would most closely replicate his proposed market. In that regard, Dr. Langenfeld began by examining 1997 government data compiled as to patient discharges and residence as indicated by zip codes. Dr. Langenfeld then rank ordered those zip codes to include first those zip codes from which Summit and Alta Bates drew the largest market share of patients and continued to add zip codes in this order until he had accounted for 85% of the hospital's patient discharges. (Hr'g Tr. at 407:11–20.) [4]

---

4. For example, if all 100 patients that resided in a particular zip code went to Summit or Alta Bates for acute inpatient services, that zip code would be included in Dr. Langenfeld's service area first because Summit and Alta Bates would have 100% of the market share of that zip code. If, on the other hand,

Through this method, Dr. Langenfeld determined that the 85% patient service area, or draw area, of Summit and Alta Bates encompassed his proposed Inner East Bay geographic market as well as the area located just east of the Oakland Berkeley Hills, through the Caldecott Tunnel, comprised of the cities of Layfayette, Moraga, and Orinda, often referred to as "Lamorinda." (PX 1082, Langenfeld Report at 28–34.)

Defendants' expert, Margaret Guerin–Calvert, derived the hospitals' service area from the same data, but chose a 90% threshold level of significance for inclusion. As a further difference in methodology, Guerin–Calvert rank ordered zip codes by the total number of residents who sought acute inpatient services from a particular hospital.[5] The zip code from which Summit and Alta Bates drew the greatest number of patients was ranked first and zip codes from which fewer numbers of patients were drawn were added thereafter in descending order. (Hr'g Tr. at 667:19–668:8.) Based on this methodology, Guerin–Calvert determined that the service area of Summit and Alta Bates encompassed not only plaintiff's proposed geographic market (including Hayward and Union City) and Lamorinda, but also cities located east of Lamorinda in Contra Costa County, such as Pittsburgh, Antioch, and Pleasanton.

In evaluating the different methodologies utilized by the parties' respective experts in deriving their service areas, the Court finds a service area based on the 90% level of significance utilized by Guerin–Calvert to be more appropriate than one based on an 85% threshold as proposed by plaintiff. Courts have generally

acknowledged the 90% level of significance. *See Tenet*, 186 F.3d at 1047 n. 4 ("A 'service area' is generally defined as the area from which a hospital derives ninety percent of its inpatients."). Indeed, in conducting his analysis of hospital service areas, Dr. Langenfeld determined a service area based on a 90% threshold. He did not, however, provide the results of that test in his expert report or at the hearing, nor did he provide any economic justification for his decision to use a percentage lower than 90% in constructing his service area.

The Court also finds that Dr. Langenfeld's method of ordering zip codes by market share does not portray the area from which hospitals currently draw their patients as accurately as Guerin Calvert's method of ordering zip codes by the actual numbers of patients that seek inpatient services. Dr. Langenfeld's methodology can result in the inclusion of less significant zip codes, such as the Presidio, from which Alta Bates draws only one or two patients but has a 100% market share, while at the same time excluding zip codes in which the hospital may have a relatively low market share but from which it actually draws hundreds of patients. (Hr'g Tr. at 671:2–14.)

Guerin–Calvert's method, on the other hand, ensures that zip codes with significant numbers of patients will be included while excluding those zip codes in which relatively few patients reside. This method more accurately reflects the importance of a zip code to the area from which a hospital draws its patients, and is also the manner in which hospitals determine their own service areas. (Hr'g. Tr. 670:7.) *See*

100 patients sought acute inpatient services at Summit and Alta Bates from a zip code that contained 200 patients, that zip code would be placed considerably further down in Dr. Langenfeld's ranking because Summit and Alta Bates would only have 50% of the market share of that zip code.

5. Using the example outlined above, if two zip codes each contained 100 patients who sought acute inpatient services from Summit

and Alta Bates, both of those zip codes would be included in Guerin–Calvert's service area in the same order of preference regardless of the number of patients residing in those zip codes that sought acute inpatient services elsewhere. Similarly, if Summit and Alta Bates drew 100 patients from one zip code and 50 patients from another, the former would be ranked higher than the latter, irrespective of the total patient population of the respective zip codes.

*Freeman Hosp.*, 911 F.Supp. at 1221 (approving "method of building the service area by including zip codes according to the number of patients each contributes...."). Although on occasion its use may result in the exclusion of sparsely populated zip codes located close to the hospitals in question, Guerin–Calvert's approach is superior to Dr. Langenfeld's, which is more likely to exclude zip codes that are more significant to an analysis of current market conditions than those excluded by Guerin–Calvert's methodology.

In comparing the service areas as determined by the parties' respective experts, it becomes readily apparent that the most significant difference between the two is that Dr. Langenfeld's service area excludes all zip codes located in Contra Costa County, with the exception of Lamorinda. (Hr'g Tr. at 402:9–25.) Through the use of an 85% threshold and by rank ordering zip codes by market shares, Dr. Langenfeld excluded those Summit and Alta Bates patients that reside in Contra Costa County to the east of the proposed geographic market, and in Fremont, Newark, and Livermore/Pleasanton, located to the southeast of the proposed market. (Hr'g Tr. 742:17–24; Def.'s Ex. 1001, Guerin–Calvert Report, Ex. F.) Because a test market includes all hospitals within the relevant service area, Dr. Langenfeld's methodology excluded Valley Memorial Hospital ("Valley Memorial"), Sutter Delta Memorial Hospital ("Sutter Delta"), and Kaiser Hospital–Walnut Creek ("Kaiser–Walnut Creek") as practical alternatives to which patients currently seeking acute inpatient services at Summit or Alta Bates could turn.

Further, even though his own 85% service area included Lamorinda, encompassing the three zip codes located just east of the Caldecott Tunnel, Dr. Langenfeld excised this region from his test market, reasoning that its exclusion would not fundamentally change his analysis because relatively few patients reside in Lamorinda and no hospitals are located there. (Hr'g Tr. at 313:10–24.) Conversely, Dr. Langenfeld extended his test market beyond the southern border of his 85% service area in order to include Hayward and Union City, "to be conservative and consistent with some market participant's views." (PX 1082, Langenfeld Rep. at 30–31.)

The Court questions these two decisions to alter the test market from that indicated by the merging parties' service area. The three zip codes that comprise Lamorinda represent 5% of Alta Bates' total patient discharges and account for more than four times as many patients as comparably sized Hayward, a zip code which Dr. Langenfeld chose to include in plaintiff's test market. (Def.'s Ex. 1001, Guerin–Calvert Report ¶ 36, n. 31.) Further, although no hospitals are located within Lamorinda itself, the region is nonetheless significant because it includes patients who currently seek acute inpatient services at Alta Bates and Summit. Patients that reside in Lamorinda would be affected by an anticompetitive price increase by hospitals located within plaintiff's test market, and accordingly must be considered in addressing the issue of where in that proposed market patients could practically turn for acute inpatient services. In this regard, the Court notes that Dr. Langenfeld did include the zip code encompassing Union City, which, like Lamorinda, does not contain any hospitals.

The Court finds that eliminating residents of the Lamorinda area while at the same time including Hayward and Union City in the test market, in an apparent effort to conform to a preconceived proposed market, tends to misrepresent current market conditions. *See Freeman Hosp.*, 911 F.Supp. at 1218 (criticizing plaintiff's expert's decision to exclude zip codes that contributed significant numbers of patients to market area hospitals from service area).

For all of the reasons expressed above, the Court finds that the proper scope of the merging parties' hospital service area is more accurately reflected by the methodology employed by defendant's expert. This area encompasses the Inner East Bay

and extends east into Contra Costa County to include those zip codes in which Valley Memorial, Sutter Delta, and Kaiser–Walnut Creek are located.

### b. LOFI–LIFO results

Because plaintiff's expert failed to follow the prescribed methodology for deriving and utilizing the service area of the merging hospitals to construct a test market, but rather constructed a test market to conform to a predetermined market, plaintiff's test market does not accurately reflect those patients that currently seek acute inpatient services at Summit and Alta Bates, or the area in which they reside. *See United States v. Rockford Mem'l Corp.*, 717 F.Supp. 1251, 1267 (N.D.Ill.1989) ("[T]he court is wary of the defendants' application [of the Elzinga–Hogarty test]. In particular, the court perceives a rather result-oriented bent in the defendants' application of the Elzinga–Hogarty test; using the numbers to confirm a predetermined market rather than to help determine a market in the first place.").

The purpose of the E–H test is to determine current market conditions by examining the area from which the merging hospitals currently draw their patients. *Mercy Health*, 902 F.Supp. at 978. As stated, the use of an 85% service area, rank ordering zip codes by market share, the exclusion of Lamorinda from the test market coupled with the inclusion of Hayward and Union City in the test market, all serve to skew the true numbers and locations of patients that currently seek acute inpatient services at Summit and Alta Bates, and who therefore would be affected by a future anticompetitive price increase.

Even with these deviations from standard methodology, however, plaintiff's test results still fail to meet the preferred 90% threshold for a strong showing that a market exists. Dr. Langenfeld's LIFO and LOFI calculations based on his proposed geographic market both yielded figures of approximately 85%. (PX 1082, Langenfeld Report at 31–34.) These results indicate that 15% of patients admitted to hospitals in plaintiff's proposed Inner East Bay market, or 18,000 patients, reside outside the Inner East Bay and the remaining 85% are residents of the Inner East Bay. Similarly, 15% of the patients who reside in the Inner East Bay, or 11,000 patients, are admitted to hospitals outside the area and the remaining 85% seek hospital treatment within the area.

Plaintiff argues that these 85% results are well within the 75%–90% range of results that, depending on the percentage, indicate to a greater or lesser extent the existence of a market. Although initially Elzinga and Hogarty were of the view that results of 75% constitute at least weak evidence of the existence of a market, they subsequently revised their evaluation and determined that a 90% result, rather than a range, more appropriately indicates the existence of a geographic market. *See* Elzinga & Hogarty, *The Problems of Geographic Market Delineation Revisited: the Case of Coal*, 23 Antitrust Bulletin 1 (1978); *Rockford Mem'l*, 717 F.Supp. at 1267 ("In other words, the Lofi and Lifo figures should ideally yield at least percentages of 90% or greater.").

Plaintiff's E–H test results do not end the Court's analysis, in any event, as the E–H test is only a starting point in analyzing a geographic market. E–H test results reflect only current market behavior, and are insufficient to determine where patients could practically turn for acute inpatient services if faced with a future anticompetitive price increase. *See Mercy Health*, 902 F.Supp. at 978 ("[the E–H test] does not pretend to answer the question of what would happen if there was an attempt to exercise market power by one of the market participants."). Patients who are currently unwilling to seek acute inpatient services at certain hospitals outside of the test market may view such hospitals as practical alternatives if faced with an anticompetitive price increase. Consequently, hospital service areas may not encompass the full range of practical alternatives open to consumers. *See Ten-*

*et,* 186 F.3d at 1051 (holding relevant geographic market was larger than merging hospitals' service areas).

Accordingly, the Court now turns from its analysis of current market conditions to consider factors which influence the alternative hospitals to which patients practicably may turn if faced with a post-merger anticompetitive price increase.

### 3. Dynamic Analysis

As stated, the chief task in determining a geographic market is to identify the suppliers to whom consumers could practically turn if faced with anticompetitive pricing. *Freeman Hosp.,* 69 F.3d at 268. Accordingly, the next step in the determination of a geographic market is to "identify other hospitals to which patients residing in the service areas could turn if they were dissatisfied with the prices or services of the merging hospitals. These hospitals, in conjunction with the [hospitals within the merging hospitals' service area] constitute the competitors in the relevant geographic market." *Freeman Hosp.,* 911 F.Supp. at 1220. *See Tenet,* 186 F.3d at 1051 ("In order to determine the actual geographic market, current market behavior must be put into a dynamic analysis. . . ."). In the present case, three factors are evaluated in conjunction with current market data to determine which hospitals would serve as practical alternatives available to patients in the event of an anticompetitive price increase: (1) service area overlap between hospitals inside the test market and hospitals outside the test market; (2) geography and travel times, and (3) the perceptions of market participants. Once all practical alternatives are identified, the geographic market is constructed by adding such hospitals to those already located within the test market to encompass the full range of hospitals to which a patient could turn for acute inpatient services if faced with an anticompetitive price increase. *See Freeman Hosp.,* 911 F.Supp. at 1220.

### a. Service area overlap

One important factor to consider at this stage of the analysis is the degree of overlap between the service area of the merging hospitals and the service areas of hospitals located outside of the test market. Where a hospital outside of the proposed geographic market draws patients from the same region from which the merging hospitals draw their patients, the hospital located outside of the test market is considered a practical alternative to which patients residing in the area of overlap can turn for acute inpatient services. *See Freeman Hosp.,* 911 F.Supp. at 1220, "[i]f the service area residents currently use other hospitals, then those hospitals are considered alternative to the [hospitals within the proposed geographic market]."

The first area of overlap between the service area of the merging parties and hospitals located outside of the test market is in Contra Costa County. Based on Guerin–Calvert's service area analysis, Summit and Alta Bates currently draw patients from numerous zip codes throughout Contra Costa County including Lamorinda and the cities of Pittsburgh, Antioch, and Pleasanton. These zip codes within the merging parties' service area overlap with the service areas of virtually every hospital located in Contra Costa County including John Muir, Mount Diablo, Kaiser–Walnut Creek, San Ramon Regional Medical Center ("San Ramon Regional"), Contra Costa Regional Medical Center, and Valley Memorial Hospital ("Valley Memorial"). Thus, if patients in Contra Costa County who currently seek acute inpatient care at hospitals located within the merging parties' service area were faced with anticompetitive pricing, the service area overlap in these zip codes indicates that those patients could practically turn to any of the hospitals located east of the Caldecott Tunnel that offer acute inpatient services, such as John Muir and Mount Diablo.

The next area of overlap, again using Guerin–Calvert's 90% service area calculations, appears in those zip codes encom-

passing Hayward and Union City, from which the merging parties and Washington Township, located in Fremont, both draw their patients. Washington Township is a taxpayer-funded hospital dedicated to serving the needs of the people who live within its district, comprised of Fremont, Union City, and Hayward. (PX 20, FTC Transcript of Jerry Fleming (Senior VP, Kaiser Permanente), May 4, 1999, at 84:2–85:3; PX 7, Decl. of Dena Maddox (Director of Network Operations, United Healthcare), ¶ 16.)

Dr. Langenfeld concluded, however, that despite the service area overlap in Hayward and Union City, Washington Township would not serve as a practical alternative for patients within his proposed market because Washington Township is geographically isolated. Although Washington Township may not serve as a practical alternative for patients that reside in the northern parts of the Inner East Bay, it certainly does serve as an alternative for patients located within its district. Indeed, Washington Township currently obtains 80% of its discharges from Fremont, Union City, and Hayward, the latter two located within plaintiff's proposed market. (PX 20, FTC Transcript of Jerry Fleming (Senior VP, Kaiser Permanente), May 4, 1999, at 84:2–85:3; PX 7, Decl. of Dena Maddox (Director of Network Operations, United Healthcare), ¶ 16.). Accordingly, the Court finds that Washington Township serves as a practical alternative for those patients located in the southern portion of the merging parties' service area.

Finally, Dr. Langenfeld did not present evidence of the service areas of San Francisco hospitals either in his expert report or at the hearing. By contrast, Guerin-Calvert's service area analysis indicates that the service areas of San Francisco hospitals overlap with essentially every zip code within the merging parties' service area. (Def.'s Ex. 907.) Although both experts determined that neither Alta Bates nor Summit drew a significant number of patients from San Francisco, the question in this case is whether hospitals in San Francisco serve as practical alternatives for patients who reside in the Inner East Bay. The fact that the combined service area of San Francisco hospitals overlaps completely with the combined service area of Summit and Alta Bates indicates that patients located within the merging parties' service area could practically turn to San Francisco hospitals for acute inpatient services in the event of an anticompetitive price increase.

### b. Geography

Despite the existence of service area overlap with hospitals located in Contra Costa County, San Francisco, and Fremont, Dr. Langenfeld opines that those hospitals do not serve as practical alternatives to which patients could turn in the event of an anticompetitive price increase, due to traffic congestion and the amount of time required to travel east through the Caldecott Tunnel and west across the Bay Bridge to San Francisco. Courts have recognized that geographic proximity and travel times are important factors to consider in determining the practical alternatives available to patients in the event of an anticompetitive price increase. *See Freeman Hosp.*, 911 F.Supp. at 1220 (recognizing importance of distance between hospitals in determining scope of relevant geographic market).

In support of its position that geographic barriers constrain the ability of patients residing within the proposed market to practically turn to hospitals located in San Francisco and Contra Costa County, plaintiff offered a survey of travel times required to reach various hospitals located in San Francisco and in Contra Costa County. For example, plaintiff's traffic engineer determined that the average time required to travel from the intersection of Pleasant Valley Avenue and Piedmont Avenue, located in the center of Oakland, to St. Francis Memorial Hospital ("St.Francis") in San Francisco, located in relatively close proximity to other San Francisco hospitals, was approximately thirty-two minutes. The average time required to

travel to John Muir in Walnut Creek, and Mount Diablo in Concord, both located on the other side of the Caldecott Tunnel, was twenty-five minutes. (PX 1082, Langenfeld Report at 24–26, Ex. Ex. 11.)

Plaintiff's own study indicates, however, that in many instances, it took less time to travel to hospitals outside the proposed geographic market from plaintiff's chosen point of departure, than to hospitals within the proposed market. For example, during the morning rush hour or during mid-day traffic, it took less time to travel to John Muir or Mount Diablo, both located through the Caldecott Tunnel and outside of plaintiff's proposed market, than it took to travel to St. Rose Hospital in Hayward, located within the proposed market. (Hr'g Tr. at 412.) During the afternoon rush hour, it took less time to travel to St. Francis in San Francisco or to San Ramon Regional, John Muir and Mount Diablo, located outside of the proposed market in Contra Costa County, than it did to travel to Doctors Hospital Pinole, located within the proposed market. (PX 1052, Pl. Travel Time Study at 1–3; Hr'g Tr. at 411:13–413:23.)

Further, plaintiff's travel time calculations do not accurately represent the times that patients within the proposed market would need to travel to hospitals outside the proposed market because plaintiff assumes that every patient in the market lives in the center of Oakland, and ignores those residents that live on the northern or southern ends of the proposed market. As Dr. Langenfeld admitted at the hearing, for those patients, seeking acute inpatient services at alternative hospitals outside the Inner East Bay may be as convenient as seeking such services at Summit or Alta Bates. (Hr'g Tr. at 411.) This is particularly significant with regard to those patients located in the southern end of the merging hospitals' service area, where patients in Hayward and Union City are actually located closer to Washington Township than to Summit and Alta Bates. (Def.'s Ex. 900.)

Finally, a review of patient flow data, including the destination of patients who leave the merging parties' service area, indicates that large numbers of patients travel across the Bay bridge to hospitals in San Francisco and through the Caldecott Tunnel to hospitals located in Contra Costa County despite the alleged geographic barriers. Data available for the combined service area of Alta Bates, Summit and Eden, an area similar to that of plaintiff's proposed market, reflects that in 1996, over 8,500 patients traveled across the Bay Bridge to seek acute inpatient services at hospitals located in San Francisco, and approximately 7,200 patients traveled through the Caldecott tunnel to seek acute inpatient services at hospitals located in Contra Costa County. (Def.'s Ex. 260 "Environmental Trends and Factors", Deloitte & Touche Consulting Report.) Further, as shown by plaintiff's own E–H test results, 15% of the patients residing in the proposed market, or 11,000 patients, sought acute inpatient services at hospitals outside of the market, despite the time involved in crossing the Bay Bridge or traveling though the Caldecott tunnel. This data indicates that, currently, more than one out of every seven patients who reside in the proposed market chose to seek care at a hospital located outside of the proposed market, even in the absence of anticompetitive pricing.

Accordingly, the Court finds that the Bay Bridge and the Caldecott Tunnel do not serve to constrain patient mobility in the East Bay to such an extent that patients who currently reside in the proposed market would not travel to hospitals located in San Francisco or Contra Costa County for acute inpatient services if faced with an anticompetitive price increase.

**c. Market participant perceptions**

A final factor considered by Dr. Langenfeld consists of the perceptions of market participants as to their competitors. If hospitals located within the test market perceive a hospital located outside of the test market to be a significant competitor,

the implication is that the hospital located outside of the test market may in fact constitute a practical alternative to which patients could turn if faced with an anticompetitive price increase. Conversely, if participants within the proposed market do not perceive a hospital located outside the proposed market to be a competitor, one may infer that such hospital is not a practical alternative. Although courts have considered this factor to be relevant in determining a geographic market, the perception of market participants is afforded considerably less weight than quantitative data addressing the practical alternatives available to patients. *See Freeman Hosp.*, 69 F.3d at 270 (discounting persuasiveness of market participant perceptions in determining geographic market).

In support of its argument that market participants view the main competitors of Summit and Alta Bates to be hospitals located within plaintiff's proposed market, plaintiff relies primarily on an Official Statement released by Summit in 1996 in connection with its Revenue Bond offering. In that statement Summit identified its primary competitors, making no reference to hospitals located outside plaintiff's proposed geographic market. (PX 46, at A-9, A-11; Hr'g Tr. at 271:12-275:9.)

Defendants argue that this document never purported to be an exhaustive review of Summit's relevant market, and, in turn, produce documents that defendants argue are more probative in that they reflect Summit's perception that its prices are constrained by hospitals outside plaintiff's proposed market. For example, in a Summit presentation to the California Medical Assistance Commission, Summit compared Summit's rates to those of hospitals located outside the Inner East Bay, including Washington Township, John Muir, and Mount Diablo, all of which plaintiff excludes from its proposed geographic market. (Def.'s Ex. 383, Presentation from Summit to Calif. Med. Assistance Comm'n (Aug. 25, 1998) at SUM008002790.)

Upon review of the various documents produced by both plaintiff and defendants from hospital administrators in the East Bay, the Court discerns no common or prevailing perception by market participants regarding the scope of Summit and Alta Bates' competition. In light of statistical data showing defendants' patient draw area overlaps significantly with that of hospitals located in Contra Costa County, San Francisco, and Fremont, the Court determines that observations of these market participants are insufficient to support a finding that any of the hospitals with which Summit and Alta Bates currently compete for patients should be excluded as practical alternatives to which patients could turn if faced with an anticompetitive price increase. *See Freeman Hosp.*, 69 F.3d at 270 (holding that in the absence of economic or statistical data indicating geographic market, district court was justified in refusing to credit market participant testimony).

### d. Critical loss test

The final method by which plaintiff attempts to prove its proposed geographic market is through the application of what is known as a "critical loss test." The critical loss test is a quantitative analysis of patient flow data and is based on the *Merger Guidelines*, which define a geographic market "to be a region such that a hypothetical monopolist ... could profitably impose at least a 'small by significant and nontransitory' increase in price ["SNIP"] ...." *Merger Guidelines* at § 1.21. The critical loss test addresses the question of whether the geographic market has been properly defined by analyzing the number of patients that must leave the market, if faced with an anticompetitive price increase, before a hypothetical monopolist would abandon its attempts to impose a SNIP. *See Tenet*, 186 F.3d at 1053 (emphasizing importance of the critical loss test in defining geographic market); *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 198 (1st Cir.1996) ("The touchstone of market

definition is whether a hypothetical monopolist could raise prices").

A hypothetical monopolist is a theoretical firm that encompasses all of the production capacity for the relevant product in a proposed geographic market, or alternatively, all firms in the relevant market acting in concert. *See Rebel Oil Co., Inc. v. Atlantic Richfield Co.,* 51 F.3d 1421, 1434 (9th Cir.1995) ("A 'market' is any grouping of sales whose sellers, if unified by a monopolist or a hypothetical cartel, would have market power in dealing with any group of buyers.") (citing to Areeda ¶ 518.1b at 534.). If all firms within the proposed geographic market could, together, profitably impose an anticompetitive price increase in the market, this would mean that customers within the market would be forced to accept the price increase because they would not have sufficient practical alternative hospitals outside of the market to which to turn.[6]

The critical loss test involves two steps: (1) determining the critical loss number of patients who would have to leave the proposed market in order to defeat a SNIP by a hypothetical monopolist, and (2) determining whether that critical loss number of patients would actually leave the market if faced with a SNIP. If fewer patients than the critical loss number would leave the proposed market, this implies that all practical alternatives have been included in the proposed market.

### (1) Critical loss

In applying the critical loss test, the Court must first determine the number of patients necessary to defeat a SNIP imposed by a hypothetical monopolist. When hospitals in a market charge a higher price for services, they increase their profits per patient, but also lose revenue as patients shift to other hospitals. If enough patients leave the market, the price increase will cease to be profitable, and presumably will be abandoned. The first step in determining the critical loss figure is calculating the contribution margin of the hypothetical monopolist. The contribution margin represents the difference between the revenue obtained in treating an additional patient and the cost incurred in treating that patient. Expressed as a percentage, it is revenue less variable costs divided by revenue. Utilizing this contribution margin, one can determine the number of patients who would need to leave the hospital before a price increase would cease to be profitable. (PX 1082, Langenfeld Report at 35.)

In applying this formula, Dr. Langenfeld performed calculations using both a 5% and a 10% price increase, or SNIP. In arriving at his opinions, however, he relied upon a SNIP of 10%. The *Merger Guidelines* specify that "[i]n attempting to determine objectively the effect of a 'small by significant and nontransitory' increase in price, the Agency, in most contexts, will use a price increase of *five percent* lasting for the foreseeable future." *Merger Guidelines,* at § 1.1 (emphasis added). Although the *Merger Guidelines* also state that the value of a SNIP may be larger or smaller than five percent depending on the nature of the industry, Dr. Langenfeld failed to provide, either in his report or at the hearing, any basis for deviating from the prescribed 5% figure. Moreover, leading commentators have adopted the 5% figure as the appropriate value of a SNIP. *See* Areeda, ¶ 527b at 200–201 ("[T]he government's 5 percent test seems more appropriate than, say, a 10 percent test. . . . [W]e emphasize that the 5 percent test of significance will govern the great preponderance of cases."). *See also Mercy Health,* 902 F.Supp. at 980 (applying 5% critical loss test).

---

**6.** Defendants' expert calculated a critical loss figure based on an assumed SNIP imposed by the merged Alta Bates/Summit entity as opposed to a hypothetical monopolist. (Def.'s Ex. 1001, Guerin–Calvert Report ¶¶ 63–64.) Defendants' critical loss analysis, although potentially relevant on the issue of anticompetitive effects once a geographic market has been defined, is not relevant in analyzing the scope of a proposed geographic market in the first instance.

Accordingly, based on the lack of any proffered basis for deviating from the 5% SNIP as prescribed by the *Merger Guidelines* and other authority, the Court finds a price increase of 5% to be the appropriate value for a SNIP in the present case. Based on a 5% price increase, Dr. Langenfeld calculated that if 5,133 – 13,187 patients, representing 4% – 10.5%[7] of all patients currently seeking acute inpatient services at hospitals in the proposed Inner East Bay market, left to seek acute inpatient services at hospitals outside that market, such price increase would be rendered unprofitable.

#### (2) Diversion analysis

In the second step of the critical loss test, plaintiff must show that the critical loss number of patients, between 4% and 10.5% of the patients that currently seek acute inpatient services at hospitals located within the proposed market, would not seek such care at hospitals located outside the proposed market if faced with a 5% price increase. *See Mercy Health,* 902 F.Supp. at 981 (holding plaintiff failed to prove a geographic market because of its failure to prove, *inter alia,* that enough people would leave the market to pass the critical loss test.).

Particularly important in analyzing the extent to which patients will seek acute inpatient services at hospitals outside of the proposed market if faced with an anticompetitive price increase is the market behavior of MCOs and IPAs. Because MCOs cover nearly 60% of the patient population in the East Bay, these organizations are to a large extent, the true consumer of acute inpatient services. *See Fed. Trade Comm'n v. University Health, Inc.,* 938 F.2d 1206, 1213 n. 13 (11th Cir. 1991) (holding true customers of acute inpatient services were third party payers).

When faced with price increases, there are numerous mechanisms through which health plans can discipline hospitals.

(Defs.' Ex. 1021; Defs.' Ex. 1012, Decl. of Jay M. Gellert at 14–15; Hr'g Tr. at 716:18–718:17.) The simplest, but rarely used, is to exclude hospitals from the plans' provider networks. (Defs.' Ex. 1026, Dep. of John Sweeney at 17–21.) The primary mechanism by which MCOs and IPAs keep prices low is through the "steering" of patients. In managing their patients' illnesses, physicians are often responsible for deciding the components to be used in providing treatment, including the hospitals to which their patients are admitted. In steering, MCOs or IPAs provide incentives to or direct physicians to refer their patients to certain hospitals. Such incentives may include direct financial incentives as well as more general risk-sharing arrangements that reward physicians for providing care in the most cost-effective environment. When faced with rising prices, MCOs can attempt to steer patients to lower cost health care providers and away from the hospital imposing a price increase, thereby pressuring the hospital to eliminate the price increase. (Defs.' Ex. 1013, Pugh Report ¶ 57.) As one witness who has been on both sides of the table explained, "there is a discipline going both ways" because "we need them, but simultaneously they need us." (Defs.' Ex. 1012, Gellert Decl. at 18, 40.)

Hospitals, in general, have high fixed costs, both in terms of the physical plant and equipment as well as the high cost of maintaining a highly skilled staff. At the same time, their profit margins are thin. (Hr'g Tr. at 508:3–12; 706:21 – 707:17; Defs.' Ex. 1013, Pugh Report ¶ 59; Defs.' Ex. 1001, Guerin–Calvert Report ¶ 63.) Steering has been quite effective in disciplining prices because hospitals are sensitive to declines in volume. (Defs.' Ex. 1001, Guerin–Calvert Report ¶¶ 63–64; Defs.' Ex. 1013, Pugh Report ¶¶ 59–61; Defs.' Ex. 1012, Gellert Decl. at 14.) This is especially true of high-value specialty

---

7. The disparity between these figures stems from the fact that Dr. Langenfeld calculated multiple critical loss figures using different sets of data and assuming different contribu-

tion margins for: (1) only managed care patients and (2) all patients. (PX 1082, Langenfeld Report, Ex. 37.)

services such as cardiac care, neurosurgery, and oncology, due to the large capital commitments required for such programs and their higher profit margins. (Defs.' Ex. 1013, Pugh Report ¶ 59; Defs.' Ex. 1012, Gellert Decl. at 15.)

Despite the proven ability of MCOs and IPAs to steer patients to lower cost hospitals, however, plaintiff argues that patients currently seeking acute inpatient services at hospitals located within its proposed market would not leave the market, if faced with a 5% price increase, because: (1) physicians can only admit patients to hospitals at which they have admitting privileges and few doctors that practice within the proposed market have admitting privileges at hospitals outside of the market; (2) patients are reluctant to leave their physicians to travel to new hospitals because of physician loyalty; (PX 12, Sankary Decl. ¶ 15; PX 13, McDermott Decl. ¶ 8; PX 14, Declaration of Dr. Peter Candell (Co–Medical Director, Alameda—Affinity Medical Group) at 8; Hr'g. Tr. at 135:11–24.), and (3) patients are unwilling to travel to hospitals located across the Bay Bridge and through the Caldecott Tunnel. (PX 5, Declaration of Arthur Kummer (VP, Prudential), ¶ 12; PX 8, Hobbs Decl. ¶ 9; PX 29, FTC Tr. of Mark Hyde (CEO, Lifeguard), June 16, 1999, at 67:25–68:20.)

In support of this assertion, plaintiff relies almost exclusively on the testimony of Bay Area health plan administrators.[8] In countering plaintiff's evidence, defendants first show that many physicians with privileges at hospitals within the Inner East Bay already have admitting privileges at other East Bay hospitals. (Hr'g Tr. at 559:2–6; Def.'s Ex. 980, Sloan Dep. at 63; Def.'s Ex. 1016, Lovett Decl. ¶ 2.) For example, 59 physicians, who collectively admitted 2,372 cases to Alta Bates in 1998, also had privileges at John Muir, and 43 physicians who admitted 2,053 cases to Summit, also had privileges at John Muir. (Def.'s Ex. 10, Sutter Presentation to FTC and AG, Tabs A and B.)

Further, the evidence shows that physicians who do not currently have admitting privileges at other hospitals can easily obtain admitting privileges; hospitals are receptive to credentialing qualified specialists at their facilities because such physicians bring in patient volume. Although the time required to gain admitting privileges varies from hospital to hospital and may, in some cases, take as long as three to four months, other hospitals grant admitting privileges much more quickly. Moreover, as the Director of Cardiac Surgery at Alta Bates testified, those hospitals that take relatively more time to grant admitting privileges still grant courtesy privileges pending the processing of permanent privilege applications. (Hr'g Tr. at 510:11–17; 573:6–574:16, 511:3.)

Next, physician loyalty does not necessarily constrain patient mobility because many patients do not have an established physician relationship and, more important, many of those patients who have an established physician-patient relationship are admitted to hospitals by a specialist, rather than the patient's family practitioner. (Defs' Ex. 989, McDermott Dep. at 64–66, 117–18.) Moreover, patient loyalty has its limitations. For example, in the experience of the CEO of the Alameda Alliance for Health ("AAH"), a local health plan with approximately 78,000 members, operating in Alameda County and serving the Medi–Cal population, approximately 1,000 of its members switch primary care physicians each month. (Defs' Ex. 983, Ibarra Dep. at 24–25; Tr. at 143:8–14; Tr. at 209:5–14; 210:2–6; 210:21–211:1; Def.'s Ex. 996, Sankary Dep. at 138.)

---

**8.** It should be noted that plan administrators do not uniformly oppose the proposed merger. For example, the president and CEO of Foundation Health Systems, the parent company of Health Net, the second largest health plan in the East Bay, has testified that he believes the possibility of a price increase due to the proposed merger is slight based on, *inter alia,* the ability of MCOs to steer patients to lower cost facilities if faced with increased prices. (Def.'s Ex. 1012, Decl. Gellert at 14–17)

Finally, neither plaintiff's witnesses nor plaintiff provide any quantitative evidence to support the assumption that patients are unwilling to travel to hospitals located in San Francisco or Contra Costa County for acute inpatient services. Indeed, many of plaintiff's witnesses appear to be testifying based on pure conjecture. As an example, albeit a rather extreme one, when asked "[w]ould you be able to shift patients north, say, as far as Pinole?", the CEO of one health care plan operating in the Bay Area responded, "I don't even know where Pinole is, but I doubt it." (PX 29 at 67:25–68:20.) As stated by the court in *Freeman Hosp.,* "[w]hile such non-empirical data may have some probative value as a starting point to evaluate this market, such data will not carry the [plaintiff's] burden. Informal, off-the-cuff remarks and anecdotal evidence concerning the marketplace are no substitute for solid economic evidence." *Freeman Hosp.,* 911 F.Supp. at 1220.

Here, in concluding that patients would not leave the proposed market due to the existence of geographic barriers and travel times, plaintiff's witnesses ignore patient flow data that shows that none of the factors upon which plaintiff relies in fact significantly constrain patients from seeking acute inpatient services at hospitals outside of plaintiff's proposed market. Based on plaintiff's own E–H test results, currently 11,000 patients, or one out of every seven patients residing in the Inner East Bay, already leave the Inner East Bay for acute inpatient services even in the absence of a 5% price increase and steering by MCOs and IPAs. (Hr'g Tr. 689; Def.'s Ex. 1001, Guerin–Calvert Report ¶ 44; Hr'g Tr. 703:14–704:7; 503:20–504:2.) Further, based on 1996 patient discharge data for the combined service area of Alta Bates, Summit and Eden, an area similar to that of the plaintiff's proposed market, defendants show that over 8,500 patients traveled across the Bay Bridge to seek acute inpatient services at hospitals located in San Francisco, and approximately 7,200 patients traveled across the Caldecott tunnel to seek acute inpatient services at hospitals located in Contra Costa County. (Def.'s Ex. 260.)

Moreover, based on plaintiff's own figures, 18,000 patients, approximately one out of every seven patients that were discharged from hospitals located within plaintiff's proposed geographic market, actually live outside of the proposed geographic market and travel across the purported geographic barriers to seek acute inpatient services at hospitals located within plaintiff's proposed market. (PX 1082, Langenfeld Report at 31–34; Hr'g Tr. 689:5–10; Def.'s Ex. 1001; Guerin–Calvert Report ¶¶ 43, 48–50.) Thus, even accepting a critical loss figure of 10.5% (the upper end of plaintiff's critical loss range using a 5% price increase), if MCOs and IPAs were able to steer only about two-thirds of the patients that currently travel into the proposed market to hospitals that are actually located closer to those patients outside of the proposed market, this loss of volume in and of itself would be sufficient to defeat a SNIP. (Hr'g Tr. 401:23–402:8.) Such would be the case even if one were to assume that not a single patient that currently resides within the proposed market would seek acute inpatient services outside of the market when faced with a 5% price increase.

Accordingly, the Court finds that plaintiff has failed to show that enough patients that currently seek acute inpatient services at hospitals located within plaintiff's proposed Inner East Bay market would not seek such services at hospitals outside of the market to defeat an anticompetitive price increase. Plaintiff relies on testimonial evidence which in turn relies on various assumptions concerning patient mobility. These assumptions are inconsistent with the facts as shown by the patient flow data and ignore the fact that, based on plaintiff's own figures, a combined total of almost thirty thousand patients either enter or leave plaintiff's proposed market to seek acute inpatient services every year even in the absence of an anticompetitive price increase or steering by MCOs and

IPAs. *See Tenet,* 186 F.3d at 1054 (criticizing "the district court's reliance on the testimony of managed care payers, in the face of contrary evidence, that these for-profit entities would unhesitatingly accept a price increase rather than steer their subscribers to hospitals [outside the proposed market]."); *Mercy Health,* 902 F.Supp. at 977 (rejecting, primarily because of defendant's strong patient flow data, plaintiff's market definition based on views of MCOs and physicians).

As defendants' counsel commented during his opening statement at the hearing, "[i]f you believe the plaintiff's market, you would believe that Conestoga wagons are still being used today, that no one ever goes over the hills because the hills are too high and you have to build a boat to take you across the Bay." (Hr'g Tr. at 36:6–9.).

#### 4.  Geographic Market Summary

For the reasons set forth above, the Court finds plaintiff has failed to meet its burden of proving a well-defined geographic market encompassing the practical alternative sources of acute inpatient services to which patients can turn if faced with an anticompetitive price increase. *See Connecticut Nat'l Bank,* 418 U.S. at 669, 94 S.Ct. 2788 (holding that plaintiff bears the burden of proving geographic market).

"Identification of a relevant market is a 'necessary predicate' to a successful challenge under the Clayton Act and thus to establishing a likelihood of ultimate success for preliminary injunction purposes." *Freeman Hosp.,* 69 F.3d at 272. Accordingly, the Court finds that plaintiff has failed to prove its prima facie case that the proposed merger between Alta Bates and Summit would substantially lessen competition in the acute inpatient services product market. *See Id.* at 268 ("Without a well-defined relevant market, an examination of a transaction's competitive effects is without context or meaning."). For this reason, plaintiff cannot prevail on its motion for preliminary injunction.

### C.  "Failing Company" Defense

Even if plaintiff had made the requisite showing as to plaintiff's case, plaintiff would not prevail on its motion for preliminary injunction, for the separate and independent reason that defendants have successfully established their "failing company" defense.

In *International Shoe Co. v. Fed. Trade Comm'n,* 280 U.S. 291, 50 S.Ct. 89, 74 L.Ed. 431 (1930), the Supreme Court first recognized the failing company defense as an absolute defense to an action under Section 7 of the Clayton Act. The rationale behind the failing company defense, as explained by the Supreme Court in *United States v. General Dynamics Corp.,* 415 U.S. 486, 507, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974), is that "the effect on competition and the loss to the company's stockholders and injury to the communities where its plants were operated will be less if a company continues to exist even as a party to a merger than if it disappears entirely from the market. It is, in a sense, a 'lesser of two evils' approach...."

In *Citizen Publishing Co. v. United States,* 394 U.S. 131, 137, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969), the Supreme Court held that, in order to satisfy the requirements of the failing company defense, defendants must show that the resources of the acquired company are "so depleted and the prospect of rehabilitation so remote" that it faces "the grave probability of business failure," and that "the company that acquires the failing company ... is the only available purchaser." *Id.* at 138, 89 S.Ct. 927. *See Olin Corp. v. Fed. Trade Comm'n,* 986 F.2d 1295, 1306–7 (9th Cir. 1993) (applying *Citizen* failing company test).

#### 1.  Financial Condition

The most important factor that courts have considered in determining whether a firm faces the "grave possibility of business failure" is whether the firm is insolvent or on the brink of insolvency

either in the bankruptcy sense, that the firm has no net worth, or in the equity sense, that the firm is unable to meet its debts as they come due. *See International Shoe,* 280 U.S. at 300, 50 S.Ct. 89 (finding failing company defense appropriate where the acquired business could not pay its debts as they came due); *Crown Zellerbach Corp. v. FTC,* 296 F.2d 800, 831–32 (9th Cir.1961), *cert. denied,* 370 U.S. 937, 82 S.Ct. 1581, 8 L.Ed.2d 807 (1962) (holding that firm was not in a failing condition were it had a positive net worth); *United States v. M.P.M., Inc.,* 397 F.Supp. 78, 100 (D.Colo.1975) (finding firm passed first prong of failing company defense where defendant was insolvent in the equity sense).

▪ Defendants first argue that Summit meets the equity definition of insolvency, based on the fact that it has been unable to meet its trade debt, and its inability to assume more debt to meet its financial obligations as they come due. In *United States v. Black & Decker Mfg. Co.,* 430 F.Supp. 729, 778–81 (D.Md.1976), the court relied upon several factors in holding that the defendants had satisfied the first prong of the failing company defense: (1) the defendant firm's accounts payable had increased $5 million in almost two years to $10.8 million; (2) vendors had imposed "a variety of sanctions ... including stopping of shipments pending payment," and (3) the defendant firm was unable to comply with covenants in its loan agreements concerning debt ratios and therefore had slight prospects for raising additional capital to meet its financial obligations.

Similarly, in the present case, Summit, as of September 30, 1999, had $8.9 million in overdue bills and has been subjected to sanctions by its suppliers such as "cash-on-delivery" terms. (Def.'s Ex. 809, Meinke Decl. ¶¶ 17, 22.) Further, defendants have shown that Summit is unable to comply with the minimum 1.35 debt service ratio requirement of its Revenue Bonds, and therefore cannot assume more debt to meet its mounting financial obligations.

(Def.'s Ex. 809, Meinke Decl. ¶ 31; Hr'g Tr. at 777:1–7.)

Plaintiff argues that Summit has let its accounts receivable, a possible source of available cash, grow too large. Plaintiff's financial expert, Jamie Hopping, testified that if the Hospital had collected on its accounts in a more timely manner, it would have more cash with which to pay its bills. (Hr'g Tr. at 801:5–17.) This increase in accounts receivable, however, is not unique to Summit, but is being experienced by hospitals nationwide. (Hr'g Tr. at 609:24–611:3.) Moreover, the issue in this case is not whether the Hospital could have done a better job in managing its finances in the past but, rather, whether it faces the grave risk of business failure today.

Plaintiff further argues that the Hospital has understated its available funds because assets of the Foundation could be used to fund capital projects at the Hospital. The account balance of the Foundation as of July 31, 1999 was $20.9 million. (PX 1090 at SUM 05000006.) As noted earlier, however, the Hospital and the Foundation are separate legal entities. The failing company defense does not require that a company deplete the assets of affiliated companies to meet the requirement that it faces "the grave possibility of business failure." Courts and the *Merger Guidelines* have applied the failing company defense to failing divisions or subsidiaries of companies that were otherwise profitable. *See FTC v. Great Lakes Chem. Corp.,* 528 F.Supp. 84, 96 (N.D.Ill.1981) ("The 'failing company' defense applies to a failing business ... whether or not it is a division of a larger corporation which is successful in other areas."); *United States v. Lever Bros. Co.,* 216 F.Supp. 887, 898–901 (S.D.N.Y.1963) (allowing sale of failing product line despite other profitable product lines); *Merger Guidelines,* at § 5.2 (acknowledging failing division defense). Further, in this instance, virtually all of the Foundation's funds are restricted, in that the donors have specified the uses to

which the money can be put. (Hr'g Tr. at 612:7–613:76; 780:25–783:9.)

The Court finds that the assets of the Foundation should not be considered in assessing the Hospital's financial condition. Accordingly, based on evidence that the Hospital has insufficient funds to meet its debt payments as they mature, the Court finds that Summit is insolvent under the equity definition of insolvency.

■ Next, defendants argue that Summit also meets the bankruptcy definition of insolvency because the fair market value of its assets is less than the value of its liabilities. (Hr'g Tr. at 759:12–13.) As of August 1999, the Hospital's balance sheet reflected long term debt obligations and current liabilities totaling $138.6 million, and assets of $191.3 million. (Def.'s Ex. 772 at SUM 050 02022; Hr'g Tr. at 770:23–771:4.) $104 million of the Hospital's assets, however, represents the book value of the Hospital's property, plant and equipment, the fair market value of which is significantly below its book value. This difference is due in large part to required seismic upgrades, estimated to cost approximately $109.7 million, which is more than the book value of the Hospital's property, plant and equipment combined. (Def.'s Ex. 809, Meinke Decl. ¶¶ 34–35.) Based on these facts and the existence of various restrictions that limit the availability of up to $24 million of the Hospital's remaining assets, defendants' financial expert, Robert Den Uyl, concluded that the fair market value of the Hospital's assets is significantly lower than the value of its liabilities. (Hr'g Tr. at 759:18–20.)

In response, plaintiff's financial expert testified that because Tenet had submitted a bid that would have allowed Summit to satisfy all of its liabilities, the fair market value of Summit's assets necessarily exceeds the fair market value of its liabilities. (Hr'g Tr. at 819:10–18.) This conclusion is based on an assumption that Tenet would make the same offer for Summit today that Tenet made in March 1998, over eighteen months ago. There is no evidence, however, indicating that Tenet would make a similar offer today, particularly in light of Summit's continued financial deterioration, or indeed, that Tenet would make any type of offer to purchase Summit. Accordingly, the Court finds Summit also meets the bankruptcy definition of insolvency as the fair market value of its liabilities exceeds the fair market value of its assets.

Finally, independent sources verify the grave nature of Summit's financial situation. Summit's outside auditor, Ernst & Young, has refused to issue an "unqualified" or "clean" opinion that Summit is a going concern and has demanded that Summit provide cash flow projections that show it will be viable through February 2001. An independent auditor's refusal to issue a clean opinion is evidence of a company's failing condition. *See Black & Decker*, 430 F.Supp. at 781 (noting "the company's financial position was such that but for the merger, [defendant's] independent auditors would not have valued the company as a going concern").

Further, should Summit not receive an "unqualified" opinion from its auditors, it will be in default under its Revenue Bonds. (Def.'s Ex. 809, Meinke Decl. at ¶ 33; Hr'g Tr. at 604:23–605:8.) If Summit defaults on its bond obligations, the insurer can force Summit to close parts of the Hospital or cease providing services. (Hr'g Tr. at 605:1–8.) The Chair of Summit's Audit and Finance Committee testified that Summit has been unable to provide the requested cash flow projections to date, and is contemplating large (9%) and imminent cuts in the Hospital's workforce as well as a severe reduction in services. (Hr'g Tr. at 603:1–11.) He also testified that in the absence of the proposed merger, the Hospital would be required to file a petition in bankruptcy. (Hr'g Tr. at 620:5–8.)

The Court finds defendants have shown that Summit faces a "grave risk of business failure" and, accordingly, that defendants have thereby satisfied the first prong of the failing company defense.

### 2. Bankruptcy Reorganization

■ Plaintiff argues that in order to make the requisite showing that it faces a "grave risk of business failure", a defendant must show that the prospects of reorganization in bankruptcy proceedings are dim or nonexistent. There is disagreement among the courts as to whether this element is an actual requirement of the failing company defense. *See Citizen*, 394 U.S. at 138, 89 S.Ct. 927 (noting many companies successfully reorganize in bankruptcy and requiring defendant to show prospects of reorganization to be dim or nonexistent); *United States Steel Corp. v. F.T.C.*, 426 F.2d 592, 608 (holding *Citizen* requires showing that prospects of Chapter 11 reorganization must be dim or nonexistent) (6th Cir.1970); *United States v. Phillips Petroleum Co.*, 367 F.Supp. 1226, 1259 (C.D.Cal.1973) (acknowledging reorganization in bankruptcy requirement); *Merger Guidelines* at § 5.1. *But see General Dynamics*, 415 U.S. at 507, 94 S.Ct. 1186 (omitting bankruptcy reorganization requirement when setting forth failing company defense in dictum); *Black & Decker*, 430 F.Supp. at 778 ("The weight of authority suggests that dim prospects for bankruptcy reorganization are not essential to successful assertion of the failing company defense."); *M.P.M.*, 397 F.Supp. at 96 ("We conclude that a[ ] defendant need not be required to show that reorganization prospects under the bankruptcy act were dim or nonexistent in order to discharge its burden of proof as to the 'failing company' defense."). *See also* Richard Posner, *Antitrust Law: An Economic Perspective* at 21 (1976) (criticizing requirement because the purpose of the defense is "precisely to avert bankruptcy.").

In the present case, defendants' financial expert testified that the likely outcome of Chapter 11 proceedings would not be successful reorganization but rather liquidation, in that the causes of Summit's financial situation are systemic and will only increase the strain on its resources over time. (Hr'g Tr. at 786:10–15.)

As noted in Section I.C. above, Summit has suffered from a large decline in revenues due to reduced Medicare payments to hospitals under the Balanced Budget Act of 1997 and the fact that more than 50% of Summit's revenue comes from Medicare patients. These effects will only increase over time as the reductions in reimbursement mandated by the act become fully implemented. Indeed, as estimated by Ernst & Young, the Balanced Budget Act will reduce Summit's revenues by at least $52.8 million in Fiscal Years 1999–2002. (Trial Ex. 809, Meinke Decl. ¶¶ 19–20; Trial Ex. 810 Hansen Decl. ¶¶ 16–17.) Moreover, as discussed earlier, Summit faces large expenditures, estimated at $109 million, in order to comply with seismic upgrades as required by the Alquist Act. This also has placed a large financial burden on Summit that will increase over time as the first deadline for meeting the upgrade requirements approaches.

Accordingly, if Summit is required to show that its prospects for reorganization under Chapter 11 are dim or nonexistent, Summit has successfully made such a showing.

### 3. Alternative Purchasers

■ The second prong of the "failing company" defense requires that the defendant prove the acquiring firm was the "only available purchaser". *See Citizen*, 394 U.S. at 138, 89 S.Ct. 927; *Golden Grain Macaroni Co. v. Fed. Trade Comm'n*, 472 F.2d 882, 887 (9th Cir.1972) (holding that defendant must be the "only available purchaser");

In order to prove that no alternative purchaser exists, courts and the *Merger Guidelines* have required the acquired company to conduct a good faith effort to seek offers from other potential purchasers. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (reversing summary judgment where material questions of fact existed as to whether defendant "was the only bona fide prospective purchaser for [the acquired firm's] business"); *United States v.*

*Pabst Brewing Co.,* 296 F.Supp. 994, 1002 (E.D.Wis.1969) (holding defendant must make "a sufficiently clear showing" that it "undertook a well conceived and thorough canvass of the industry such as to ferret out viable alternative partners for a merger."); *Merger Guidelines,* § 5.1.

In the present case, Summit did conduct an extensive good faith search for purchasers beginning in 1995 and continuing through to 1998, during which period Summit and its investment banker, Morgan Stanley, formulated a detailed and thorough proposal process and sought out numerous potential partners. (Def.'s Ex. 811, Decl. Landers ¶¶ 4–6.) As a result of this search, Summit received bona fide offers from Sutter and Tenet, and in March, 1998, decided to accept the offer from Sutter.

Plaintiff argues that Tenet should be considered a reasonable alternative purchaser because of its March 1998 offer. Plaintiff does not contend there is any viable alternative to Sutter other than Tenet. Tenet's March 1998 offer, however, was made over eighteen months ago when Summit was in substantially better financial condition than it is today, and before Summit became a failing company. As Tenet's Vice President of Acquisition and Development testified, any possible offer that Tenet might make in the future would have to be based on an entirely new investigation of Summit's financial condition, including an analysis of "the reasons for [the Hospital's] operating deterioration since we started to talk to them." (Hr'g Tr. at 174:2–8.)

Further, since March 1998, Summit representatives have repeatedly contacted Tenet, to determine whether Tenet remained interested in acquiring Summit. Tenet failed to make any offer in response to these inquiries, and stated that "[w]e'd take a look at it, but at this point we are not in a position to make an offer...." (Hr'g Tr. at 173:16–18.) Tenet's vague expression of interest is not sufficient to elevate Tenet to the status of a viable alternative purchaser. In *United States v.*

*Culbro Corp.,* 504 F.Supp. 661 (S.D.N.Y. 1981), evidence that a firm had "a very high level of interest in the possible acquisition" of the defendant was found insufficient to establish that firm as an alternative purchaser, where its interest had "never been translated into a viable offer." 504 F.Supp. at 669. There, as here, the acquired firm's availability for purchase has been well-known throughout the industry and in investment circles. *See Id.* Tenet, like the putative alternative buyer in *Culbro,* has offered no more than generalized expressions of interest; it has made no concrete proposal. As in *Culbro,* the likelihood of a purchaser other than Sutter "is a mere will-o'-the-wisp." *Id.*

Accordingly, due to the fact that Tenet, the only possible alternative purchaser of Summit, has failed to make an offer to purchase Summit even in response to Summit's attempts at soliciting an offer, the Court finds that no reasonable alternative purchaser of Summit exists, and thus that defendants have satisfied the second prong of the failing company defense.

In sum, Summit faces the grave risk of business failure, and given the lack of any alternative purchaser, if the present merger is enjoined, Summit will be unable to continue as a going concern. The Court therefore finds that defendants have made the showing required to establish their failing company defense.

## CONCLUSION

For the reasons set forth above, the Court finds that plaintiff is not entitled to a preliminary injunction as it has failed to prove "either (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips sharply in its favor." *Odessa Union,* 833 F.2d at 174.

Specifically, plaintiff has failed to show probable success on the merits in that it has failed to prove a well-defined geographic market and thereby has failed to prove its prima facie case of anticompeti-

tive effect. Further, defendants have successfully established their failing company defense. The Court also finds that the balance of hardships tips sharply in favor of defendants in this case. Allowing Summit and Alta Bates to merge will assure that Summit can continue to serve its community, while enjoining the proposed merger will have the effect of causing the third largest hospital in the East Bay to cease to exist.

In *Tenet*, under similar circumstances, the Eighth Circuit counseled: "[A] court ought to exercise extreme caution because judicial intervention in a competitive situation can itself upset the balance of market force, bringing about the very ills the antitrust laws were meant to prevent.' This appears to have even more force in an industry, such as healthcare, experiencing significant and profound changes." *Tenet*, 186 F.3d at 1055 (citing *Syufy Enter.*, 903 F.2d at 663). The Court finds the Eighth Circuit's observations to be particularly apt in the present case.

Plaintiff's motion for preliminary injunction is hereby DENIED.

**IT IS SO ORDERED.**